UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

LEOR EXPLORATION       CASE NO. 09-60136-CIV-SEITZ/O'SULLIVAN
PRODUCTION LLC, et al.,
    Plaintiffs,

v.

GUMA AGUIAR,
    Defendant.
_____/

GUMA AGUIAR,        CASE NO. 09-60683-CIV-SEITZ/O'SULLIVAN
    Plaintiff,

v.

WILLIAM NATBONY, et al.,
    Defendants.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the Motion for Sanctions Against Guma

Aguiar (DE# 135 in Case No. 09-60136, DE# 51 in Case No. 09-60683, 10/1/09) and

the Corrected Motion to Hold Guma Aguiar in Contempt (DE# 228 in Case No. 09-

60136, 12/2/09; DE# 126 in Case No. 09-60683, 12/3/09) filed by the Leor parties.[1] This

matter was referred to the undersigned by the Honorable Patricia A. Seitz pursuant to

28 U.S.C. § 636(b)(1)(A). See Order Setting Trial Date, Pretrial Deadlines and Referral

_____

[1] The term "Leor parties" refers to Leor Exploration & Production LLC, Pardus
Petroleum L.P., Pardus Petroleum LLC, Thomas Kaplan and William Natbony. The law
firm of Katten Muchin Rosenman, LLP and Non-parties Ali Erfan, Theresa Hilliard,
Kenton Holliday, Robert Newman, Xi Xi and Mark Cozzi joined in the motion to hold
Guma Aguiar in contempt. See Notice of Joinder in Plaintiffs' Amended Motion to Hold
Guma Aguiar in Contempt (DE# 63 in Case No. 09-60683, 10/9/09); Non-parties'
Joinder in Plaintiff's Motion to Hold Guma Aguiar in Contempt (DE# 310 in Case No. 09-
60136, 3/2/10); Katten Muchin Rosenman, LLP's Notice of Joinder in the Motion for
Contempt Against Guma Aguiar (DE# 214 in Case No. 09-60683, 4/28/10).

to Magistrate (DE# 49 in Case No. 09-60136, 5/5/09; DE# 29 in Case No. 09-60683, 8/18/09). Evidentiary hearings were held on October 23, 2009, October 26, 2009, December 4, 2009, December 9, 2009 and June 7 through 9, 2010. Upon careful consideration of the testimony, pertinent filings and exhibits, the record, arguments of counsel and the applicable law, the undersigned respectfully **RECOMMENDS** that the Motion for Sanctions Against Guma Aguiar (DE# 135 in Case No. 09-60136, DE# 51 in Case No. 09-60683, 10/1/09) be **GRANTED**, that the Corrected Motion to Hold Guma Aguiar in Contempt (DE# 228 in Case No. 09-60136, 12/2/09; DE# 126 in Case No. 09-60683, 12/3/09) be **GRANTED in part and DENIED in part** and that the Court enter an order finding Aguiar in contempt, dismissing Guma Aguiar's claims in Case No. 09-60683-CIV-SEITZ/O'SULLIVAN and striking his defenses in Case No. 09-60136-CIV-SEITZ/O'SULLIVAN.

## INTRODUCTION

On January 26, 2009, Leor Exploration & Production LLC (hereinafter "Leor"), Pardus Petroleum L.P., Pardus Petroleum LLC and William Natbony (hereinafter "Natbony") as the trustee of two GRATs[2] initiated a lawsuit (Case No. 09-60136-CIV-SEITZ/O'SULLIVAN) against Guma Aguiar (hereinafter "Aguiar") alleging breach of fiduciary duty, conversion and fraudulent inducement. See Complaint (DE# 1 in Case No. 09-60136, 1/27/09); Amended Complaint (DE# 53 in Case No. 09-60136, 5/12/09). Aguiar filed a lawsuit in state court on March 26, 2009 against Natbony, Thomas Kaplan

---

[2] The term "GRAT" is an acronym for Grantor Retained Annuity Trust. It is a mechanism used to make financial gifts to family members while avoiding certain tax obligations.

2

(hereinafter "Kaplan") and Katten Muchin Rosenman, LLP (hereinafter "Katten") alleging fraud, negligent misrepresentation, constructive fraud, breach of fiduciary duty, legal malpractice and conspiracy. See Notice of Removal (DE# 1 in Case No. 09-60683, 5/11/09).[3] The action (Case No. 09-60683-CIV-SEITZ/O'SULLIVAN) was subsequently removed by Katten to this Court on May 8, 2009. Id. Both cases were consolidated by this Court for discovery purposes. See Order on Consolidation (DE# 65 in Case No. 09-60136, DE# 16 in Case No. 09-60683, 6/4/09).

On October 1, 2009, the Leor parties filed their Motion for Sanctions Against Guma Aguiar (DE# 135 in Case No. 09-60136, DE# 51 in Case No. 09-60683, 10/1/09). On October 15, 2009, Katten filed a notice of joinder in the instant motion. See Katten Muchin Rosenman LLP's Notice of Joinder in the Motion for Sanctions Against Guma Aguiar (DE# 70 in Case No. 09-60683, 10/15/09). Aguiar filed his response to the instant motion on October 16, 2009. See Aguiar's Opposition to Motion for Sanctions (DE# 165 in Case No. 09-60136, DE# 71 in Case No. 09-60683, 10/16/09). The Leor parties filed their reply on October 20, 2009. See Reply Memorandum in Support of Motion for Sanctions Against Guma Aguiar (DE# 170 in Case No. 09-60136, DE# 74 in Case No. 09-60683, 10/20/09). Katten filed a separate reply. See Katten Muchin Rosenman LLP's Reply to Guma Aguiar's Opposition to Motion for Sanctions (DE# 73

---

[3] Aguiar alleged fraud, negligent misrepresentation and conspiracy against Natbony and Kaplan. See Notice of Removal (DE# 1 at 22-25 in Case No. 09-60683, 5/11/09). The constructive fraud, breach of fiduciary duty and legal malpractice counts were alleged against Natbony and Katten. Id. On September 14, 2009, Aguiar filed an Amended Complaint. See Amended Complaint (DE# 47 in Case No. 09-60683, 9/14/09). The Amended Complaint added Pardus Petroleum LP as a party to Case No. 09-60683-CIV-SEITZ/O'SULLIVAN and alleged a breach of contract claim against that entity. Id.

in Case No. 09-60683, 10/1/09). On January 12, 2010, the Leor parties filed Movants'

Motion to Supplement Record on Movants' Motion for Sanctions Against Guma Aguiar

(DE# 264 in Case No. 09-60136, DE# 155 in Case No. 09-60683, 1/12/10). The Court

granted the Leor parties' motion on March 19, 2010. See Order (DE# 318 in Case No.

09-60136, DE# 204 in Case No. 09-60683, 3/19/10).

On December 2 and 3, 2009, the Leor parties filed their Corrected Motion to Hold

Guma Aguiar in Contempt (DE# 228 in Case No. 09-60136, 12/2/09; DE# 126 in Case

No. 09-60683, 12/3/09). Guma Aguiar filed his response on April 28, 2010. See

Response to Motion to Hold Guma Aguiar in Contempt (DE# 328 in Case No. 09-60136,

DE# 215 in Case No. 09-60683, 4/28/09).[4] The Leor parties filed their reply on May 12,

2010. See Leor Plaintiffs' Reply Memorandum in Support of Motion to Hold Guma

Aguiar in Contempt (DE# 337 in Case No. 09-60136, DE# 223 in Case No. 09-60683,

5/12/10).

On October 23, 2009, October 26, 2009, December 4, 2009 and December 9,

2009, the undersigned held evidentiary hearings to determine whether Aguiar accessed

or caused the unauthorized access of Kaplan's email account. The parties presented

live testimony and submitted documentary evidence for the Court's consideration. The

Leor parties presented the testimony of Aguiar, Kaplan and Andrew Obuchowski in

support of their motion. John C. Racich and Zafrir Pazi testified on behalf of Aguiar. The

undersigned admitted into evidence the Leor parties' exhibits 1-10, 12, 40-65, 68-71,

---

[4] In support of this response, Aguiar filed exhibits under seal. See Guma Aguiar's
Unopposed Motion to File Exhibits to Opposition Memorandum under Seal (DE# 329 in
Case No. 09-60136, DE# 216 in Case No. 09-60683, 4/29/10).

4

74-94 and 96-97 and Aguiar's exhibits 15, 20, 100-101, 147-151, 154-158, 161-172 and 191.

The undersigned also held an evidentiary hearing from June 7, 2010 through June 9, 2010. The purpose of this hearing was to allow Aguiar to present evidence regarding his lack of bad faith and to determine the appropriate sanctions to recommend against him. During this hearing, the Leor parties presented the testimony of Mark Cozzi, Kenton Holliday, Theresa Hilliard and Dr. Phillip Resnick. Aguiar presented the testimony of Dr. Kenneth Duckworth, Kaplan and Natbony. The undersigned admitted into evidence the Leor parties' exhibits 15, 18, 30, 259-266, 268-269, 257-258, 270-275, 276, 278, 307-312 and 314-323 and Aguiar's exhibits 200-256, 363, 365, 367-369, 374, 376-377, 380, 392, 400, 409, 413-414, 419, 421, 425-427, 431, 435-439, 442-443, 445, 450, 452, 454, 458-459, 460, 463-464, 466-467, 469-471, 480, 483 (page 1 and ¶¶ 30-31 only), 490, 495, 501-536, and 549.

## FINDINGS OF FACT

### I.    Thomas Kaplan

Thomas Kaplan is Guma Aguiar's uncle.[5] Kaplan is the Chairman of Leor's Board of Directors and controls numerous companies including Leor, Tigris Financial Group (hereinafter "Tigris"), Pardus Petroleum L.P. and Pardus Petroleum LLC.

From approximately 2004 through September 2009, Kaplan used an email

---

[5] There have been several feuds in Kaplan and Aguiar's family. Kaplan was estranged from his father, Jason Kaplan, for fifteen years. In 2003, he unsuccessfully attempted a reconciliation with this father. In January 2003, Kaplan's father threatened to harm Kaplan's wife and children and Kaplan threatened to kill his father. Kaplan and his father have since made amends.

account, kaplan600@aol.com (hereinafter "AOL account") as his primary email account. Aguiar helped Kaplan setup the AOL account. The password for the AOL account was "Mirale," an affectionate nickname for Kaplan's mother-in-law. Kaplan used this password for the AOL account from approximately 2004 through September 2009. Kaplan did not share the AOL account password with Aguiar. However, Aguiar knew that Kaplan's mother-in-law was sometimes referred to as "Mirale." Kaplan did not authorize Aguiar to access emails in the AOL account.

As of September 2009, approximately 45,000 emails were stored in the AOL account. Kaplan used the AOL account to communicate with his family, friends, employees, business associates and attorneys including the attorneys representing him in the instant case.[6] Beginning in 2004, Kaplan directed his attorneys at Katten to correspond with him regarding various legal issues, including Leor, through the AOL account. Among the people who Kaplan regularly communicated with using his AOL account was Natbony, discussed infra, p. 7. The Leor parties (including Natbony) and Katten have a joint prosecution and joint defense agreement in the instant case. Kaplan, Kaplan's attorneys in the instant case, Natbony and the attorneys for Katten have exchanged numerous emails through the AOL account regarding facts, witnesses, mediation and deposition strategies and the strengths and weaknesses of the instant case.

## II.    Leor

Leor is a corporation that was primarily involved in oil and gas exploration in

---

[6] The term "instant case" refers to Case Nos. 09-60136-CIV-SEITZ/O'SULLIVAN and 09-60683-CIV-SEITZ/O'SULLIVAN.

Texas. Leor is controlled by Kaplan. In November 2007, Leor sold substantially all of its assets to EnCana Oil and Gas (hereinafter "EnCana") for approximately $2.55 billion dollars. One of the key issues in the instant case is the percentage of Aguiar's equity interest in Leor and, by extension, Aguiar's share of the proceeds from the sale of Leor's assets to EnCana.

## III.   William Natbony

William Natbony was a partner at the Katten law firm and handled many of Kaplan's legal disputes. In May 2007, Natbony left Katten to become Chief Executive Officer of Tigris, one of Kaplan's companies. Natbony is also the trustee of two of Kaplan's GRATs. While at Katten, Natbony and other Katten attorneys communicated with Kaplan through the AOL account. Similarly, since becoming CEO of Tigris, Natbony has sent hundreds of emails to Kaplan's AOL account. During the course of this litigation, Natbony corresponded with Kaplan through Kaplan's AOL account regarding litigation strategies in the instant case.

## IV.   Guma Aguiar

Guma Aguiar is Kaplan's nephew. Aguiar and Kaplan were business partners. Aguiar was the Chief Executive Officer of Leor until he was terminated on December 12, 2008 by Natbony.

Aguiar suffers from severe bipolar disorder[7] and psychosis. Bipolar disorder is characterized by episodes of mania and depression. Manic episodes are sustained periods of increased activity and energy associated with euphoria or irritability and

---

[7]   Bipolar disorder is a form of mental illness that affects two to three percent of the American population.

hostility. A person in the throes of a manic episode can have periods of lucidity. Depressive episodes are characterized as sad, low mood states.

Psychosis is the inability to discern reality from fantasy. Aguiar's psychosis manifested itself in both grandiose and paranoid delusions. In the spring of 2008, Aguiar expressed the grandiose belief that he is or could be the Messiah. With respect to his paranoid delusions, Aguiar has stated on multiple occasions that Kaplan was trying to kill him. Aguiar believes that he has been poisoned, that he was shot in the back from a helicopter, that snipers have been following him and that the medical staff at an Israeli hospital were injecting him with poison in order to kill him.

Aguiar's bipolar disorder first manifested itself in 1997 when he was Baker Acted[8] at a Florida psychiatric hospital for approximately 12 days. At the time, Aguiar was 19 years old.[9] Aguiar experienced the onset of another manic episode in mid-June 2009[10] and is still recovering from this episode. From approximately June 2009 through January 2010,[11] Aguiar was also psychotic. Aguiar is presently in treatment for his mental illness.

In addition to mental illness, Aguiar has a substance abuse problem. Substance abuse can often follow a manic episode and can exacerbate existing manic symptoms.

_____

[8] An involuntary commitment under section 394.467 of the Florida Statutes.

[9] The first onset of bipolar disorder typically occurs during the late teens or early twenties.

[10] Aguiar may have been manic prior to this time period, however this is the relevant time period for purposes of the motions filed by the Leor parties.

[11] Aguiar may have been psychotic at other times.

An individual who is manic may attempt to alleviate the symptoms of a manic episode, such as a decreased need for sleep, racing thoughts or distractability, by self-medicating. In Aguiar's case, he experienced racing thoughts, insomnia, talkativeness, rapid speech and irritability when manic. Aguiar self-administered legal and illegal substances including alcohol, marijuana, Xanax (an anti-anxiety medication), Ambien (a sleeping pill), anabolic steroids (testosterone) and OxyContin (an opiate).[12] Some of these substances are consistent with an attempt by Aguiar to self-medicate his manic symptoms. However, Aguiar's steroid use is not indicative of an attempt to self-medicate.

Aguiar's mental illness, particularly Aguiar's messianic beliefs, caused his relationship with his uncle to deteriorate. On May 27, 2008, Kaplan sent Aguiar an email regarding their need to "part company." See Exhibit 308.[13] Kaplan's email advises Aguiar that despite their rift, Aguiar could still use Itzhak "Dutsi" Dar, Kaplan's Chief of Security, to improve his own security. The email states, in part, as follows:

> You are my flesh and blood, the apple of my eye, and your safety will always be my concern. In that respect, should you still wish Dutsi's assistance, you are free to avail yourself of his skills. On the other hand, his is an intimate role and if you wish to continue on your own without him (and by extension me), I will understand.

---

[12] The Leor parties argue that Aguiar's drug use precipitated his mental illness. However, none of Aguiar's six treating physicians diagnosed Aguiar with substance-induced mania or psychosis. Additionally, substance-induced mental illness is typically short-lived and Aguiar has been experiencing symptoms of mania and psychosis since mid-June 2009. Given Aguiar's history, his substance abuse is likely to exacerbate, but not cause, his underlying mental illness.

[13] Exhibit 308 was admitted to show what was relayed to Aguiar at the time and not for the truth of the matter asserted. See Transcript, June 9 2010 Evidentiary Hearing (DE# 394 at 45 in Case No. 09-60136, 6/16/10).

Id.  On December 15, 2008, Kaplan sent an email to his sister, Aguiar's mother, stating that she should:

> be advised that whatever legal war [Aguiar] starts, others will finish. The offensive that is launched will be across the broadest front imaginable. In presenting the various cases, [Aguiar]'s reputation will be destroyed, utterly and thoroughly.
>
> *   *   *
>
> In light of this letter, I would say that it is now my patience that is wearing thin. [Aguiar] has tugged at the tiger's tail once too often.

See Exhibit 154.

At the end of 2008, Aguiar told his security team that he and his family had been threatened by Kaplan and that Kaplan was suing him. As a result, Aguiar's security team increased its security measures by providing 24-hour security around Aguiar's house and escorting Aguiar and his family whenever they left the house. Mr. Dar left Aguiar's employ in December 2008.

From June 10, 2009 through July 1, 2009, Aguiar sought treatment for his manic symptoms from Dr. Zipora Arison, a psychiatrist in Ft. Lauderdale, Florida. Dr. Arison noted that Aguiar was talkative, irritable, overstimulated and suffering from insomnia. Dr. Arison prescribed large doses of Seroquel, an anti-psychotic medication, in an attempt to treat Aguiar's symptoms.

On June 19, 2009, Aguiar was arrested by the Broward County Sheriff's Office. Aguiar believed that his arrest was orchestrated by Kaplan. There is no evidence to support Aguiar's belief that Kaplan was responsible for Aguiar's arrest. In July 2009, Aguiar became increasingly concerned about his personal safety. While on a trip to Monte Carlo, Monaco, Aguiar believed he had been poisoned. He was treated at

10

Princess Grace Hospital for abdominal pain. Aguiar's medical evaluation shows that the medical staff at Princess Grace Hospital did not suspect poisoning (they did not order a toxicology report) and there was no evidence to support Aguiar's belief that he had been poisoned.

Before arriving in Israel from Monaco, Aguiar notified his security team that they were to pick him up from the airport in an inconspicious manner. When Aguiar's security team arrived at the airport, they observed Aguiar walking very fast. Aguiar insisted on leaving the airport immediately. On the drive home, Aguiar was panicky and kept looking over his shoulder. Aguiar told his security team that there had been two assassination attempts on his life, one was an attempted poisoning. His security team had to stop the car three times so Aguiar could vomit. Aguiar explained to his security team that the poison was causing him to vomit.

As a result of the July 2009 incident in Monaco, Aguiar's security team increased its security efforts. During this time, Aguiar began suspecting that there was a leak in his security team. Aguiar also told his security team that he believed he was being followed.[14] In order to thwart the surveillance, Aguiar's security team changed Aguiar's routine, by escorting Aguiar out of his residence at different times and preparing a decoy car. Aguiar's security team also implemented counter-surveillance.

During the relevant time period, Aguiar appeared in several televised interviews where he did not exhibit any outward manifestations of a mental illness. See, e.g., Exhibit 270 (August 25, 2009 video of Aguiar from Mike Huckabee's television show

---

[14] Aguiar and his family have been and continue to be surveilled by people working for Kaplan.

appearing normal); exhibit 275 (October 22, 2009 video of Aguiar being interviewed on the Sports Channel showing no outward appearance of a mental illness).

In violation of the Court's Order (DE# 88 in Case No. 09-60136, 6/22/09), Aguiar flew to New York City in November 2009 to confront Kaplan at a restaurant where Kaplan was dining with his wife. Following this confrontation, Aguiar sent Kaplan a text message (exhibit 76). The text message states as follows:

> Nice move to the "boys" for trying to frame Guma today. . . to[o] bad their intelligence is worse that his counter intelligence which he had to install because of the lies under oath in front of numerous judges around the world! He has had to endure death threats[,] assassination attempts, cover ups, stalking of his family including kids, sisters, mom, brother[,] grandparents and HIS wife!!! [F]inally they broke GUMA'S mother f***ing back!!! They will ALL be exposed along with Harley, Tucker, Dutsi, Patricia, Jason, Leib and Bill . . . oh, I[']ll happily turn over ALL my photos of [D]aphne [Kaplan's wife], Little Leandro and Leorianee [Kaplan's children]!!!!!

Id. (capitalization and punctuation in original). In the fall and winter of 2009, Aguiar sent disturbing and harassing emails to Kaplan, Natbony and nonparty witnesses. These emails are discussed in Section IV of this Report and Recommendation.

On January 14, 2010, Aguiar was involuntarily committed at Abarbanel Mental Health Center (hereinafter "Abarbanel") in Tel Aviv, Israel, as a result of a medical complaint filed by his wife. Aguiar's wife reported that Aguiar was "using drugs, drinking alcohol[ ], talk[ing] a lot, not sleeping at night or during the day. . . ." See Exhibit 504. The following day, Aguiar was examined by medical staff at Abarbanel who determined that Aguiar was "in a psychotic state accompanied by an acute lack of judgment and perception of reality." See Exhibit 505. The medical staff observed that Aguiar was "violent and aggressive, threatened to harm the doctor and threatened to kill the

doctor's husband." Id. Aguiar remained at Abarbanel until he was transferred to Chaim Sheba Medical Center (hereinafter "Chaim Sheba") in Tel Hashomer, Israel. Aguiar received treatment at Chaim Sheba until he was discharged on February 17, 2010. On February 19, 2010, Aguiar was voluntarily admitted to McLean Hospital and Pavilion (hereinafter "McLean") in Belmont, Massachusetts. Aguiar remained at McLean until March 4, 2010 when he was discharged against medical advice. On April 1, 2010, Aguiar was once again seen by Dr. Zipora Arison. She noted that Aguiar was clinically depressed and had not yet returned to his baseline mental state.

## V.   The Hacking

Aguiar had control of the following email addresses: gumaaguiar@aol.com, gumaaguiar77@aol.com and guma@mail.pcic.co.il. Aguiar or someone on behalf of Aguiar gained unauthorized access, or "hacked," into Kaplan's AOL account from approximately July 10, 2009[15] to September 7, 2009.  By hacking into the AOL account, Aguiar obtained access to all of Kaplan's emails including the emails contained in the "sent" and "deleted" folders and any subfolders created by Kaplan. These emails included exchanges between Kaplan and his attorneys regarding the instant case.

On or about September 7 or 8, 2009, Kaplan learned that the AOL account had

---

[15] The Leor parties have presented evidence that on July 26, 2008, an email (exhibit 68) dated July 23, 2008 from Kaplan to Natbony with the subject line "Guma" was forwarded from the AOL account to Aguiar's email account. An electronic copy of this email (exhibit 68) was not produced in discovery. The Leor parties have argued that Aguiar hacked into the AOL account on July 26, 2008 and forwarded this email (exhibit 68) to himself. The undersigned finds that while it is undisputed that this email (exhibit 68) was forwarded to Aguiar's email account, the unlikely event that Kaplan accidentally forwarded this email to Aguiar has not been ruled out. Thus, the undersigned does not find evidence of hacking by Aguiar as early as July 26, 2008.

been compromised. On that day, Kaplan received a telephone call from Andy Shapiro, the general counsel for Tigris, about the hacking. Mr. Shapiro learned of the hacking because Ron Rothenberg, Kaplan's broker at Smith Barney, reported receiving a total of 13 read receipts[16] for emails that he had previously sent to Kaplan at the AOL account. Mr. Dar also received a read receipt for an email he had previously sent to Kaplan. These read receipts were not sent from the AOL account because web-based email, such as AOL, would not have the capability to send a read receipt to the original sender.[17]

During the investigation, Kaplan learned that the hacking had been effectuated using a computer in Israel through a company called PCIC.[18] The read receipts indicated that the account sending the read receipts was the email account guma@mail.pcic.co.il. These read receipts indicated that the 13 emails from Mr. Rothenberg and the email from Mr. Dar that were originally sent to the AOL account were now residing in the guma@mail.pcic.co.il email account. Although only 14 read receipts were generated, by hacking into the AOL account and downloading Kaplan's emails, Aguiar had access to all of Kaplan's emails.

In addition to downloading Kaplan's emails through an email software program

---

[16] A "read receipt" is a system-generated email sent to the sender of an email when the recipient opens the email. It confirms that the recipient has opened the email, but not necessarily opened any attachments.

[17] Had Aguiar accessed the AOL account through the AOL website using Kaplan's password, the emails would not have generated read receipts.

[18] Kaplan later initiated an action against PCIC and others in Israel as a result of the hacking.

such as Microsoft Outlook,[19] Aguiar also gained access to the AOL account by directly logging into the AOL account from AOL's website or AOL's client software using Kaplan's password. From July 10, 2009 through September 10, 2009, there were numerous logins to the AOL account from AOL's website or from AOL's client software. See Exhibit 91. On at least 25 different occasions, there were logins to the AOL account from a server in Israel while Kaplan was not in Israel. Id. Additionally, there were at least 12 instances of a login by servers located in different countries within a few hours of each other, indicating that someone, other than Kaplan, was logging into the AOL account. Id. On September 10, 2009, there were two failed attempts to log in to the AOL account from Israel. Id. By that time, Kaplan had discovered the hacking and had changed his password.

On January 8, 2010, the law firm of Winston & Strawn, LLP, Aguiar's counsel, received a fax from an anonymous sender. See Exhibit 276. The fax contained emails from the AOL account. Id. On January 8 and 9, 2010,[20] Aguiar sent two emails (exhibits 257 and 258).[21] In one of those emails Aguiar states: "Just because I have a camera in his a** doesn't mean I want people dropping off info about Tom [Kaplan] on Shabbat! Alan, [p]lease ask Tom's officers to stop harassing me please . . . Someone just

---

[19]  The message headers for these emails indicated that the read receipts were generated from a Microsoft Exchange network. A common email software program used with Microsoft Exchange is Microsoft Outlook.

[20]  Exhibit 258 was sent by Aguiar on January 9, 2010 but because of the time difference it was received on January 8, 2010.

[21]  Exhibits 257 and 258 were sent from the gumaaguiar77@aol.com email account.

15

dropped these pictures and the attachment off at my house . . . . what the hell?" <u>Id.</u>[22]

Attached to the emails (exhibits 257 and 258) was a 55-page compilation of

approximately 73 emails containing confidential communications from Kaplan's AOL

account. <u>See</u> Exhibit 312.[23] Some of the emails in the 55-page document were the

same emails that had been included in the fax sent earlier that day to Winston &

Strawn, LLP.

**VI.   Nonparty Witnesses**

   **A.   Itzhak "Dutsi" Dar**

On February 4, 2009, Aguiar left numerous threatening voicemails for Mr. Dar.

Aguiar told Mr. Dar that Mr. Dar needed to call Aguiar back within a specified period of

time. In one of the voicemails, Aguiar told Mr. Dar that if Mr. Dar did not return Aguiar's

phone call, Aguiar would "go forward with proceeding with [Aguiar's] strategy . . . ." <u>See</u>

Exhibit 42. In another voicemail Aguiar states, in part, as follows:

> Dutsi, my friend, I just wanted to let you know that the time has expired.
> I'm sorry but, unfortunately you give me no choice except to go forward
> with proceeding with justice and I need to go forward and unfortunately
> you've put yourself in a position where you've compromised – you've
> compromised my security as the head of my security and the evidence is
> overwhelming. And the people who will be taking on the case are
> confident that there's going to be severe repercussions and I wanted to
> give you an opportunity. Like I said last time I said I promise you, Dutsi, I

---

[22] The undersigned finds no reason to believe the text of Aguiar's email implying that an individual anonymous delivered a document containing copies of 73 emails from Kaplan's AOL account to Aguiar's house. However, the fax and the emails establish that Aguiar continues to have in his possession confidential emails consisting of attorney-client communications between Kaplan and his attorneys related to the instant case.

[23] Exhibit 312 is a privilege log. The actual attachment to Exhibits 257 and 258 was filed by the Leor parties under seal as Exhibits 310 and 311. Aguiar's counsel have not been privy to these documents.

will be merciful. All I want is for you to talk to me and be honest and tell
me the truth.

Exhibit 45.[24] Later in the same voicemail Aguiar advises Mr. Dar that he would "be
caught not in the middle, but . . . in the front." Id.

### B. Mark Cozzi

Mark Cozzi was the Executive Vice President and Chief Financial Officer of Leor
from April 1, 2005 until June 30, 2007. Mr. Cozzi resigned from this position on June 30,
2007 and had a consulting agreement with Leor from July 1, 2007 to December 31,
2007. In late 2008, Mr. Cozzi spoke to Aguiar regarding Aguiar's termination from Leor
and Aguiar's desire to retain counsel. Mr. Cozzi provided Aguiar with the name of an
attorney at Winston & Strawn, LLP. In March or April 2009, Mr. Cozzi was subpoenaed
for deposition in the instant case. Mr. Cozzi's deposition was initially scheduled for June
18, 2009.[25] A few days prior to Mr. Cozzi's scheduled deposition, Aguiar left two
voicemails on Mr. Cozzi's telephone. When Mr. Cozzi returned the calls, Aguiar seemed
agitated. Aguiar told Mr. Cozzi that Mr. Cozzi and Aguiar had been "screwed" by Kaplan
and Natbony and that Aguiar was determined to "screw" Kaplan and Natbony. During
the conversation Aguiar insisted on flying to Chicago to meet with Mr. Cozzi to discuss
the litigation. Mr. Cozzi told Aguiar that he could not or did not want to meet with Aguiar
and that it was not appropriate. Mr. Cozzi later told Aguiar that he would meet with him
but that they could not discuss the litigation. Aguiar told Mr. Cozzi that if they could not

---

[24] Exhibits 42 and 45 are audio recordings. The undersigned was not provided
with a transcript of these records.

[25] Mr. Cozzi's deposition took place on August 14, 2009.

discuss the litigation, he did not see a purpose in meeting. A week later, Aguiar left a

voicemail on Mr. Cozzi's telephone advising Mr. Cozzi that Aguiar was in Chicago and

wanted to meet with him. Aguiar's message startled Mr. Cozzi and prompted him to

seek security personnel for his deposition.

On November 17, 2009, Aguiar sent a series of disturbing emails (exhibits 55,

57, 59 and 61) to numerous recipients, including Mark Cozzi. One of these emails

contains the subject line: "Assassination Investigation." See Exhibit 55. The body of the

email states as follows:

> Broward County Lt. Gregory S. Gordon, Operations Supervisor with the
> Division of Internal Affairs has granted Guma Aguiar a formal investigation
> against Thomas Kaplan in connection with Kaplan's assassination attempt
> on June 19th 2009 of Guma Aguiar. Officials are looking into other covert
> activities which Thomas Kaplan has been connected to in Broward County
> regarding the financial support of numerous officials in order to harm
> Kaplan's former business partner Guma Aguiar. Broward County has
> begun a massive hunt to find out all of those who were involved in the plot
> against Aguiar Friday Night, June 19, 2009. At this time the investigation is
> connected to Thomas Kaplan who is in a multi-billion dollar dispute with
> his former business partner, Leor Energy Founder and CEO Guma Aguiar.
> Currently the massive web of those involved both directly and indirectly
> include police officers, Broward County officials, retired officers, lawyers,
> Rabbi's [sic] and accountants.

Id. (capitalization in original). Aguiar sent another email on November 17, 2009 with the

subjectline: "The Flood Begins . . . . . . . . . . . . . . . . . . . . . . . . . . tAMALE.K is

EXPOSED!" See Exhibit 57 (capitalization in original). The body of the email reads as

follows:

> 1) Picture of Guma Aguiar being marched into a room by three of Tom
> Kaplans "boys."
>
> The "officers" inform Aguiar that William Natbony was funding this Friday
> Night Progrom, June 19th 2009, together with Dutsi Dar on behalf of EJF
> ...........This still shot shows Aguiar being royally escorted out of an

18

isolation cell on the third floor where Aguiar was killed for the second time on that Good Friday . . . Aguiar after being gassed, electrocuted and beaten with club[]s while listening to Dutsi Dar on a speaker phone tell him that Kaplan's fantasy is to rape Jamie [presumably, Aguiar's wife] in front of their children while Tropper plays with himself ...... "after he blows his shofar of course!"
GUMA

Id.

Aguiar also sent an email with the subject: "Kaplan and his 'boys' vs Aguiar . . . .

June 19th 2009." See Exhibit 59. It states as follows:

Mark 15:2 And Pilate asked him, Art thou the King of the Jews? And he answered unto them, "Thou sayest it."

Then the officers took Aguiar, and scourged him.

And the soldiers put on him a purple puma Israel Football Association robe which had the name Israel inscribed on the back and they said unto him, Hail, King of the Jews! and they smote him with their hands, clubs, mace and electricity.

Then Kaplan mocked Aguiar by saying "who is this King of Israel who wants to build Jerusalem and the Third temple?["]

Newly obtained footage obtained through the discovery process in Israel which shows: Kaplan's "boys"singing along to songs from Mel Gibson's soundtrack 'the [P]assion of the Christ."

Aguiar begs them to please let him listen to someone else before he dies . . . .They respond by saying "that the scripture might be fulfilled" And they changed the soundtrack to [B]raveheart.....

Id. (emphasis omitted). Approximately an hour later, Aguiar sent another email (exhibit

61). The subject on that email (exhibit 61) is "Fwd: FW: congratulations!" Aguiar writes:

"Why is [sic] did Tom Kaplan send Aguiar this congratulations email? Kaplan has

attempted to kill Aguiar many ways and many times ..... now its [sic] his turn to

suffer!!!!!!!!!!!!!!!!!!!!!!" See Exhibit 61.[26]

On December 14, 2009, Mr. Cozzi received a voicemail from Aguiar. See Exhibit

277. The voicemail stated as follows:

> Hey Cozzi, its Guma. Listen, man, sh*t is getting very, very confusing
> around here. Because Tom is being indicted. Bill is being indicted. The
> f**king IRS is coming after us, dude. And I don't really want to go to jail
> over all of this sh*t that has happened. I'm going to need to speak to you
> man unless you want to have to deal with this:"

> [Discourse by another individual about difficulties/challenges/ability to tap
> cell phones and land lines.]

> "How [are] you going to put up with this, dude. Seriously. Come to the
> f**king side of the winner, man. [Chuckles] Do you really want to keep
> suffering like this, because if you do, I will f**king ratchet this up, dude, to
> a level that you will be crying out in pain? OK, man. I want you to call me
> back, and I am insisting that you do it now, before I show up at your
> f**king house. OK?"

---

[26] Embedded in the email (exhibit 61) is an email dated November 5, 2007 from
an individual named Howard Crosby to Kaplan at the AOL account. See Exhibit 61. The
embedded email reads:

> Dear Tom,

> I just saw the EnCana announcement, and would like to offer
> congratulations. Well done!

> Regards,

> Howard

Id. A second embedded email purports to be a response from Kaplan. It reads "Many
thanks . . . though the credit belongs to Guma! T" Id. Mr. Crosby then appears to
forward Kaplan's response to an individual named John, that email reads:
"John, Response from Tom . . . .I don't have Guma's email, perhaps you could sent [sic]
him a congratulations from us as well. . . HC." Id. John responds to Mr. Crosby
indicating that he has forwarded the email to Guma and provides Guma's email
address. Id.

Id. (quotation marks and brackets in original).[27]

The following day, December 15, 2009, Aguiar sent another email (exhibit 269).

This email was sent to numerous recipients including Mark Cozzi, Kaplan and Natbony.

See Exhibit 269. The subject of this email is "Re: FW: Guma - Temple Mount article." Id.

In this email, Aguiar states:

> I will be holding you accountable in every way. I want an answer.
>
> I want my name added to the trust as the Trustee by the close of business today or else I want your name and address. This is not a warning. I will be walking in to [sic] a Citibank and moving some money to some strategic locations in order to provide security against terror threats coming from undisclosed locations. As of the close of business you will no longer be able to hide because I am taking over everything including your businesses. If you disagree with this then please email me now because we are in the process of changing accounts and removing trustees that have performed poorly over the last 11 months. This is an order that will result in the loss of sleep if there is not an instant response. I want results TODAY or else I am going to fire the first 10 people on Tom's team . . . They will find themselves in a very bad place soon!!!
>
> You can run but you can't hide . . . . Judgment day is here. I am the man who claims to rule over Tom's house so let someone stop me. . . Who dares???? Happy Hanuka [sic].

Id. (capitalization in original).

### C.   Kenton Holliday

Kenton Holliday has been the President of Leor since March 2006. In December 2008, Aguiar called Mr. Holliday and told Mr. Holliday that he was going to hire "high-powered lawyers" in order to pursue his goal of acquiring at least a minimum of 50 percent of the proceeds of the Leor-EnCana sale. Aguiar asked Mr. Holliday if Mr.

---

[27] Aguiar left this message on Mr. Cozzi's cell phone. Mr. Cozzi personally transcribed the voicemail (exhibit 277) but did not save it because he was afraid that if he kept the voicemail his telephone might accidentally redial Aguiar.

Holliday would help him. Aguiar offered Mr. Holliday a share of the proceeds. Mr.

Holliday refused to help Aguiar.

On or about February 6, 2009, Mr. Holliday sent Aguiar a letter by email and

overnight delivery requesting that Aguiar return all proprietary data belonging to Leor.

Aguiar called Mr. Holliday the same day. <u>See</u> Exhibits 15 and 30. The following

exchange took place:

> Kenton: (Inaudible) - - yeah, he told me the same thing. I keep hearing a
> beeping. Guma, you're not taping this call?
>
> Guma: No. Beeping?
>
> Kenton: Yeah.
>
> Guma: You're hearing what beeping?
>
> Kenton: I'm hearing beeping. I'm just asking, you're not taping this phone
> call?
>
> Guma: No, this call - - this - - this phone call is - - nothing is beeping. I'm
> getting phone - - I'm getting - - people are trying to call me.

<u>See</u> Exhibit 15 at 83. Aguiar did in fact tape his telephone call with Mr. Holliday as

evidenced by Exhibit 30. When confronted with this audio recording during his

deposition testimony Aguiar initially responded, "I did." <u>See</u> Exhibit 200 at 79. Aguiar

then changed his testimony and stated: "I wasn't taping it. Not at that point. I didn't think

the tape recorder was working." <u>Id.</u> Aguiar then stated that "Shortly after -- after he

[Kenton Holliday] asked me that question, he hung up the phone, and my other phone

started ringing. And I went and answered my other phone. It was him. And I don't recall

exactly what happened, but apparently the tape recorder was on the whole time. I

thought it was off." <u>Id.</u> at 81. Later, Aguiar attempted to defend his actions by claiming

that taping a telephone call was legal in Israel "if somebody calls you." Id.

During this same telephone call, Aguiar told Mr. Holliday that Mr. Holliday's interests were aligned with Guma's interests:

> [L]et's go back the two years, when we were  - - when we were in the trenches together, I'm telling you right now, I have all the evidence, I have everything. I don't care what's been written about me. **But if I go down, that means you're going down, that means T[h]eresa is going down, that means that Mark is going down**. . . .

See Exhibit 15 at 151 (emphasis added). Aguiar further stated the following:

> My - - my - - my only problem is that if I knew that you guys were not with Leor, no way - - no problem. No problem. But if you are with Leor, and Leor is suing me, then my lawyers' job is to - - so to vindicate me and I'm telling you right now, T[h]eresa will be finished. They - - I already  - - they already have her locked down. They already have - - they already have her locked down. She's done. I mean, unless - - unless - - obviously, also I - - also I pull them off of her. Which I - - which I'm hoping I'll do. But she's finished. **Now I'm calling you to let you know that I don't want to go that route with you at all. At all.**

See Exhibit 15 at 174-75 (emphasis added).

### D.    Theresa Hilliard

Theresa Hilliard was the Comptroller of Leor from September 2005 until December 31, 2008. As the Comptroller, Ms. Hilliard was responsible for the maintenance and preparation of all financial records for Leor including tax records.

Towards the end of 2008, when Ms. Hilliard's employment with Leor was coming to an end, Aguiar called Ms. Hilliard and told her that if she was considering employment at another oil and gas venture headed by Natbony or Kaplan, that she would be working for the people who betrayed Aguiar and that he would consider it a personal betrayal.

On December 1, 2009, Ms. Hilliard sent correspondence (exhibit 259) to all the

indirect partners of Leor, including Aguiar, informing them that Leor had received a notice of an administrative tax proceeding[28] by the IRS for the tax year ended 2006 regarding a 2005 EnCana-Leor tax partnership. The letter read as follows:

> Dear Mr. Aguiar:
>
> As a former indirect partner in Leor Energy, LP (through Portland Energy Partners L.P.) and pursuant to Internal Revenue Code §6223(g) and regulation §301.6223(h)-1, please find attached a copy of the notice of beginning of administrative proceeding ("NBAP") for partnership Encana-Leor 2005 Tax Partnership (in which Leor Energy, LP was a partner) for the tax year ended December 2006.

Exhibit 259. Ms. Hilliard sent a second letter dated December 1, 2009 containing similar language for the tax year ended November 2007. Id.

After sending this letter, Ms. Hilliard received a series of disturbing emails from Aguiar. On December 11, 2009, Aguiar blind copied Ms. Hilliard on an email to the CEO of EnCana. See Exhibit 260. The email relayed the story of a woman who engaged in a betrayal and contained references to severed heads and sexual violence. Id. Ms. Hilliard was upset and felt threatened as a result of receiving this email.

Ms. Hilliard received another email from Aguiar the next day, December 12, 2009, containing the subject: "Emailing: 8." See Exhibit 261. The sole recipient listed in the "to" section of the email was Ms. Hilliard. The email reads as follows: "We see you hiding in your rooms . . . you sick f**kers." Id. Attached to the email was the letter Ms. Hilliard sent Aguiar regarding the notice of administrative proceeding for the tax year ended November 2007. Id.

Aguiar sent another email two days later on December 14, 2009. See Exhibit

---

[28] A notice of administrative proceeding advises a taxpayer that its tax return has been selected for review by the Internal Revenue Service ("IRS").

263. The recipients of that email included Theresa Hilliard, Kenton Holliday and Mark Cozzi. Id. In this email Aguiar stated:

> Let's have a call next Monday morning so we can figure out how to fix this f**k up that you all are responsible for . . . I am the only one here who has the good fortune of being immune to this IRS audit due to my unique status as [a] potential beneficiary ...

Id. Fourteen minutes later Aguiar send a second email. See Exhibit 262. Ms. Hilliard was courtesy copied on this email. Id. It reads: "This isn't going to stop until someone dies and then what will you guys do? Don't say ... I didn't warn you all!!!!!!" Id. On December 15, 2009, Aguiar sent another email. See Exhibit 264. The recipients of this email included Theresa Hilliard, Kenton Holliday and Mark Cozzi. Id. The subject of this email reads: "Kaplan threatens to Kill Theresa." Id. The body of the email states: "Bad Boys try to f**k with me ........." Id.

On December 15, 2009, Aguiar called Ms. Hilliard's cell phone. Ms. Hilliard did not answer the phone. Aguiar left a long voicemail.[29] Ms. Hilliard could not discern Aguiar's words but Aguiar used an angry, shouting voice.

On December 19, 2009, Ms. Hilliard received another email from Aguiar. See Exhibit 265. The subject of this email was: "Warning . .. Failed Messiah!!! These 8 Wicked Men WILL continue to BURN..." Id. (capitalization in original). The attachments to this email included pictures of Kaplan. Id. Aguiar sent another email on December 22, 2009. See Exhibit 266. The email recipients included Theresa Hilliard, Mark Cozzi and Kenton Holliday. Id. The subject of this email was "Fwd: Kaplan Arrested for

---

[29] Ms. Hilliard was not 100 percent certain that this was Aguiar's voice. However, Ms. Hilliard recognized the telephone number as Aguiar's cell phone number and her telephone identified the caller as Aguiar because Ms. Hilliard had saved Aguiar's number in her contact list.

Involvement in Sex Scandal." Id.

## LEGAL ANALYSIS

### I.      Motion for Sanctions Against Aguiar

The Leor parties move for sanctions against Aguiar pursuant to the Court's inherent power. See Motion for Sanctions Against Guma Aguiar (DE# 135 at 7-8, 10/1/09).[30] The Court's inherent power is derived from the Court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (internal citations and quotation marks omitted). "The key to unlocking [the] court's inherent power is a finding of bad faith." Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998); see also Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11th Cir. 2002) (noting that "before a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct constituted or was tantamount to bad faith.") (citation and quotations marks omitted). "A court should be cautious in exerting its inherent power and 'must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees.'" Byrne v. Nezhat, 261 F.3d 1075, 1106 (11th Cir. 2001) (citing Chambers, 501 U.S. at  50).

### A.      Guma Aguiar Acted in Bad Faith

The Leor parties have met their burden of showing by clear and convincing evidence that Aguiar acted in bad faith when he hacked into Kaplan's AOL account and

---

[30] The instant motion, response and replies thereto were simultaneously filed in Case Nos. 09-60136-CIV-SEITZ/O'SULLIVAN and 09-60683-CIV-SEITZ/O'SULLIVAN. In this Report and Recommendation, the undersigned will cite to the page numbers corresponding to the filings in the lower numbered case, Case No. 09-60136-CIV-SEITZ/O'SULLIVAN, unless otherwise noted.

accessed privileged communications between Kaplan, his attorneys and Natbony. "A party demonstrates bad faith by, inter alia, delaying or disrupting the litigation or hampering enforcement of a court order." Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1306 (11th Cir. 2009). The parties dispute whether the bad faith conduct necessary to unlock the Court's inherent power is subjective or objective. The Leor parties argue that an objective standard of bad faith is sufficient to meet their burden. The Eleventh Circuit has stated that "[b]ecause sanctions are measured against objective standards of conduct, 'objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently.'" In re Ocon, No. 08-11226, 2009 WL 405370, *1 (11th Cir. Feb. 19, 2009) (per curiam) (citing Amlong & Amlong, P.A. v. Denny's Inc., 500 F.3d 1230, 1241 (11th Cir. 2007)). Aguiar counters that the Leor parties must show subjective bad faith and that they have failed to meet this standard.[31] It is unclear whether subjective or objective bad faith is necessary to unlock the Court's inherent power. See Bettis v. Toys R Us, No. 06-80334-CIV, 2009 WL 5206192, *8 (S.D. Fla. Dec. 30, 2009) (observing that "[i]n this Circuit, it is unclear whether sanctions may be imposed sua sponte under . . . the Court's inherent power for conduct that is not undertaken in subjective bad faith" but concluding that "[a] careful reading of the Eleventh Circuit's opinions in these areas supports the understanding that sanctions may only be imposed under the Court's

---

[31] The cases cited by Aguiar in his proposed findings of fact and conclusions of law are not analogous to the instant proceedings. See Gutter v. E.I. Dupont De Nemours, 124 F. Supp.2d 1291, 1312-13 (S.D. Fla. 2000) (does not address bad faith or the court's inherent power); In re Baron's Stores, Inc., No. 97-25645-BKC-PGH, 2007 WL 1120296, at *8 (Bankr. S.D. Fla. Apr. 12, 2007) (same); Seismograph Serv. Corp. v. Offshore Raydist, Inc., 263 F.2d 5, 23 (5th Cir. 1958) (same).

inherent power for conduct that is taken in subjective bad faith."); In re Mroz, 65 F.3d 1567, 1576 (11th Cir. 1995) (noting that "there is nothing preventing a federal court from exercising its inherent power to sanction an attorney, a party, or a law firm for their subjective bad faith."). The Court does not need to resolve this issue here because Aguiar has demonstrated subjective and objective bad faith in hacking into Kaplan's AOL account. The record shows that Aguiar had the subjective intent to "win at all costs" including through the hacking of Kaplan's confidential attorney-client communications and the intimidation of witnesses. Although Aguiar has shown that he suffers from a mental illness, for the reasons discussed below, Aguiar has not demonstrated that his mental illness precluded him from forming subjective bad faith. Accordingly, the Leor parties have shown by clear and convincing evidence that Aguiar possessed the requisite bad faith for unlocking the Court's inherent power.

In Eagle Hospital, the Eleventh Circuit affirmed a district court's imposition of sanctions and the entry of a default judgment against the defendants where one defendant, Dr. Gerst, "had been secretly monitoring [the plaintiff] Eagle's confidential email communications." 561 F.3d at 1301. During the litigation, Dr. Gerst filed an affidavit with the district court. Attached to that affidavit were confidential email communications "between Eagle personnel and Eagle's attorneys." Id. at 1302. Eagle deposed Dr. Gerst regarding the confidential attorney-client communications he had obtained. Throughout his deposition, Dr. Gerst asserted the Fifth Amendment and "refused to explain how and when he had intercepted these emails, whether he had help doing so, and whether he continued to have the ability to intercept privileged internal and attorney-client email communications." Id. The Eleventh Circuit found that

28

"[t]he record support[ed] the district court's finding that [Dr.] Gerst acted in bad faith,"

Eagle, 561 F.3d at 1306, based on the following:

> [T]he documents attached to [Dr.] Gerst's affidavit demonstrated that [Dr.] Gerst had access to privileged materials covering a period from December 13, 2003 through September 13, 2005 and [the district court] reasonably inferred that [Dr.] Gerst had engaged in extensive and disruptive surveillance of privileged communications. From [Dr.] Gerst's refusal to explain the extent of his electronic eavesdropping or his ongoing ability to intercept privileged communications, the [district] court inferred that [Dr.] Gerst "continue[d] to maintain the ability to intercept the communications." Because [Dr.] Gerst was a doctor and a frequent litigator, the [district] court surmised that [Dr.] Gerst would be familiar with the notion of privileged information and would know that he should not be intercepting confidential emails.

Id.

Similarly here, the undersigned finds that Aguiar acted in bad faith when he hacked into Kaplan's AOL account. The Leor parties have shown by clear and convincing evidence that Aguiar: (1) accessed, reviewed and retained at least some of Kaplan's privileged communications which he then distributed to his counsel and others on January 8, 2010 and January 9, 2010 and (2) in the course of these proceedings, Aguiar has repeatedly threatened Kaplan, his family, his chief of security and current and former employees in a manner evidencing that Aguiar's acts and intentions were neither innocent, nor out of fear and safety concerns. The Leor parties have further shown that Aguiar's conduct in hacking Kaplan's emails and intimidating witnesses is clearly related to this litigation. Aguiar's misconduct has disrupted the litigation. The Court has had to stay discovery, continue the trial date and devote approximately nine months, thus far, to addressing Aguiar's misconduct. Aguiar's invasion of Kaplan's privileged communications and retention of at least some of these documents, see

Exhibits 310 and 311, have further disrupted the litigation in that they have rendered a fair trial in this case impossible.

Aguiar attempts to distinguish <u>Eagle Hospital</u> by arguing that, unlike <u>Eagle Hospital</u>, there is no evidence here that Aguiar sought to gain a litigation advantage in the instant case. The Court finds that the Leor parties have presented clear and convincing evidence of Aguiar's intent to "win at all costs" and that Aguiar's actions of hacking into Kaplan's AOL account and intimidating witnesses were specifically aimed at gaining a litigation advantage in the instant case. The fact that Aguiar may not have ultimately gained an advantage from his actions is of no consequence.

Aguiar also attempts to distinguish <u>Eagle Hospital</u> from the instant case by arguing that in <u>Eagle Hospital</u> there was a possibility that the defendant could continue to access the plaintiff's emails, whereas here Kaplan has changed his password and discontinued his use of the AOL account. Although Aguiar may not have access to any additional attorney-client communications sent to Kaplan's new email address, the harm has already occurred in Aguiar being privy to prior confidential communications between Kaplan and his counsel concerning this case. The undersigned finds no assurances in the fact that Kaplan has changed his password and email address and has taken steps to prevent additional hacking into his private electronic communications. Aguiar has demonstrated as late as January 2010 that he has retained copies of some, if not all, of the emails from Kaplan's AOL account including emails containing attorney-client communications about this case. <u>See</u> Exhibits 310 and 311. The undersigned finds a very real danger in Aguiar continuing to have access to copies of emails originating from the AOL account. Aguiar cannot unlearn the information he has gained, and continues

to have access to, as a result of his hacking. Thus, the distinction raised by Aguiar does not affect the undersigned's conclusion that Aguiar's conduct has compromised the function of the adversarial process and the integrity of this Court.

Aguiar invoked the Fifth Amendment privilege against self-incrimination and refused to answer many[32] questions regarding whether he hacked into Kaplan's AOL account.[33] The court is permitted to draw an adverse inference in a civil case from a

---

[32] Although Aguiar invoked the Fifth Amendment privilege in response to most questions at the October 23, 2009 evidentiary hearing, he did testify that he had never heard of the email address guma@mail.pcic.co.il, had never used it and did not know how PCIC obtained entrance to Kaplan's AOL account. See Transcript, October 23, 2009 Evidentiary Hearing (DE# 186 at 47, 63-64, 10/26/09). The undersigned does not find Aguiar's testimony credible. Aguiar has previously lied in the instant case. Aguiar lied to Kenton Holliday when he told Mr. Holliday that he was not recording their telephone call. See Exhibit 15 at 83. Aguiar also lied during his deposition when he was asked about recording the conversation he had with Mr. Holiday. See Exhibit 200 at 79-81. The undersigned had the opportunity to observe Aguiar's mannerisms and demeanor at the October 23, 2009 evidentiary hearing and finds that he is not a credible witness. See United States v. Boulette, 265 Fed. Appx. 895, 898 (11th Cir. 2008) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.'"). Aguiar further undermined his credibility at the October 23, 2009 evidentiary hearing when he made repeated requests on direct examination to have questions read back to him because he purportedly did not remember them, however when a question was read back, Aguiar would make comments about how the question that was read back deviated from the original question. The record in this case shows a well-documented willingness by Aguiar to lie. Thus, the undersigned finds the two areas in which Aguiar provided testimony to be not credible.

[33] Aguiar also asserted the Fifth Amendment in response to Kaplan's request to search Aguiar's computer and obtain information from PCIC. In November 2009, the undersigned issued an Order requiring Aguiar to deliver to Kaplan's counsel "all computers and all computer records associated with PCIC . . . , any device associated with PCIC . . ., IP Address 82.166.49.58, guma@mail.pcic.co.il or gumaaguiar@aol.com, and any transmissions in electronic format or otherwise." See Order (DE# 208, 11/17/09). The Order (DE# 208) further required that Aguiar "[d]eliver a signed written waiver and consent to PCIC. . . .for the production to . . . Kaplan . . . of all of . . . Aguiar's data and records in PCIC's possession associated with IP Address

defendant's refusal to testify on self-incrimination grounds. See Arango v. U.S. Dept. of the Treasury, 115 F.3d 922, 926 (11th Cir. 1997). The undersigned finds by adverse inference that Aguiar used the gumaaguiar@aol.com email address, that Aguiar hacked into Kaplan's AOL account and that Aguiar read confidential attorney-client emails from the AOL account between Kaplan, Kaplan's counsel and Natbony regarding this litigation.[34] The undersigned further finds by adverse inference that Aguiar, or someone on his behalf, used the guma@mail.pcic.co.il email and that Aguiar, alone or with assistance, used the PCIC server to hack into Kaplan's AOL account.

Aguiar's constitutional rights have not been violated by the imposition of adverse inferences. "The decision to invoke the Fifth Amendment does not have to be consequence-free." Eagle Hosp., 561 F.3d at 1304 (citing United States v. White, 589

---

82.166.49.58, the email account guma@mail.pcic.co.il, and any other email address or other email account[s] of Guma Aguiar." Id. Aguiar filed a statement with the Court indicating that "he w[ould] not produce his computer and that, even if he did control the computer server of PCIC and kn[e]w[ ] its contents, Aguiar w[ould] not provide a waiver of rights to PCIC . . ., based on his rights under the Fourth, Fifth and Sixth Amendments of the U.S. Constitution." See Statement Regarding Computers (DE# 207-1, 11/16/09).

[34] Of note, Aguiar continues to have access to at least some of Kaplan's confidential attorney-client emails. See Exhibits 310 and 311 (confidential attorney-client communications attached to emails sent by Aguiar on January 8 and 9, 2010, Exhibits 257 and 258). The January 8 and 9, 2010 emails were sent from the gumaaguiar77@aol.com email address. During his testimony on October 23, 2009, Aguiar was not asked whether he used the email address gumaaguiar77@aol.com. Nonetheless, the undersigned finds that this email address is also controlled by Aguiar. The January 8 and 9, 2010 emails were sent to many of the same recipients who also received emails from the gumaaguiar@aol.com email account, including Aguiar's counsel. The emails appear similar to the prior emails sent from the gumaaguiar@aol.com email address. Thus, it cannot seriously be disputed that the gumaaguiar77@aol.com email address did not belong to Aguiar.

F.2d 1283, 1287 (5th Cir. 1979)).[35] Nonetheless, "[a] court . . . must not 'so unduly burden the employment of silence as to make the decision to testify involuntary.'" Id. (citing White, 589 F.2d at 1287). Moreover, "a dismissal following the assertion of the Fifth Amendment violates the constitution where the inferences drawn from Fifth-Amendment-protected silence are treated as a substitute for the need for evidence on an ultimate issue of fact." Id. (citing Avirgan v. Hull, 932 F.2d 1572, 1580 (11th Cir. 1991)). While invoking the Fifth Amendment may or may not[36] have deprived Aguiar of an important defense, there is no indication that the invocation of the Fifth Amendment alone would have necessarily resulted in an adverse ruling against Aguiar. White, 589 F.2d at 1286. Given the ample independent corroborating evidence in the record that Aguiar hacked into Kaplan's AOL account,[37] it is appropriate for the undersigned to draw adverse inferences from Aguiar's invocation of the Fifth Amendment.[38]

Aguiar's desire to gain an advantage in this litigation by any means necessary is

---

[35] The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[36] It is unclear what defenses would have been available to Aguiar had he testified since the evidence overwhelmingly shows that Aguiar or someone on his behalf hacked into the AOL account. Nonetheless, by asserting the Fifth Amendment, Aguiar was unable to provide testimony in his defense.

[37] Aguiar has not presented any credible evidence to refute his hacking of the AOL account.

[38] At the evidentiary hearing, Aguiar's counsel also asked the Court to make an adverse inference against the Leor parties from Kaplan's assertion of the attorney-client privilege when he was asked to disclose attorney-client communications to Aguiar's counsel. The undersigned is unaware of any legal authority that supports Aguiar's argument. Therefore, the undersigned declines to make an adverse inference against the Leor parties.

evidenced by his conduct. Aguiar espoused an "us versus them" attitude. He told multiple witnesses that if they were on Kaplan's side that Aguiar would respond accordingly. For instance, Aguiar advised Theresa Hilliard that if she agreed to work for Natbony or Kaplan on another oil and gas venture, he would consider it a personal betrayal. See Transcript, June 7, 2010 Evidentiary Hearing (DE# 392 at 138, 6/16/10). Similarly, Aguiar told Kenton Holliday that as long Mr. Holliday was not on Leor's side Aguiar would have "no problem." See Exhibit 15 at 174 (stating that "if I [Aguiar] knew that you [Mr. Holliday and others] were not with Leor, no way - - no problem. . . . But if you are with Leor, and Leor is suing me, then my lawyers' job is to - - so to vindicate me. . . ." ).

Aguiar sent a barrage of threatening and intimidating messages by email, text messaging or voicemail to Kaplan, Natbony and other witnesses in the instant case including Itzhak Dar, Mark Cozzi, Kenton Holliday and Theresa Hilliard. Some of the statements in Aguiar's emails, text messages and voicemails were overt threats and others can only be construed as thinly-veiled attempts to harass, coerce and intimidate witnesses. See, e.g., Exhibit 15 (stating in a voicemail to Kenton Holliday that ". . . if I [Aguiar] go down, that means you're going down, that means T[h]eresa is going down, that means that Mark is going down. . . ."); exhibit 262 (stating in an email sent to several recipients including Theresa Hilliard that "[t]his isn't going to stop until someone dies and then what will you guys do? Don't say . . . I didn't warn you all!!!!!!"); exhibit 269 (stating in an email to numerous recipients including Mark Cozzi and Bill Natbony, that "I [Aguiar] will be holding you accountable in every way" and that "You can run but you can't hide . . . . Judgment day is here."); exhibit 277 (insinuating to Mr. Cozzi that if Mr.

34

Cozzi did not return Aguiar's call, Aguiar "w[ould] f**king ratchet this up . . .  to a level

that [Mr.Cozzi] w[ould] be crying out in pain").  The clear purpose of these

communications was to obtain an advantage in this litigation.

Aguiar's conduct shows a disturbing pattern of attempted manipulation,

intimidation and coercion. In many instances, Aguiar tried to turn witnesses against

Kaplan by making unfavorable statements about Kaplan. See, e.g., Transcript, June 7,

2010 Evidentiary Hearing (DE# 392 at 26-27, 6/16/10) (advising Mark Cozzi in a

telephone conversation that Mr. Cozzi and Aguiar had been "screwed" by Kaplan);

exhibit 277 (advising Mark Cozzi that Kaplan and Bill Natbony had been indicted and

that the IRS was after Mr. Cozzi and Aguiar); exhibit 264 (sending an email to Theresa

Hilliard, Kenton Holliday and Mark Cozzi with the subject: "Kaplan threatens to Kill

Theresa."); exhibit 266 (sending an email to Theresa Hilliard, Kenton Holliday and Mark

Cozzi with the subject: "Fwd: Kaplan Arrested for Involvement in Sex Scandal."). In one

instance Aguiar even tried to bribe Mr. Holliday with a share of the proceeds from the

Leor-EnCana sale if Mr. Holliday would agree to help Aguiar with his stated goal of

obtaining a minimum of 50 percent of those proceeds. These communications show

specifically targeted attempts by Aguiar to get witnesses to align themselves with Aguiar

and against Kaplan. When Aguiar's initial overtures did not work, Aguiar made threats to

witnesses in an attempt to get the witnesses to contact him or align themselves with

Aguiar in the litigation. See Exhibit 15 at 151 (insinuating to Kenton Holliday that his

interests were aligned with Aguiar's interests and that if Aguiar "went down," Mr.

Holliday, Theresa Hilliard and Mark Cozzi, among others, would also "go down"); exhibit

15 at 174-75 (telling Mr. Holliday that Theresa Hilliard was finished but that Aguiar did

not want to go that route with Mr. Holliday); exhibit 42 (stating that if Mr. Dar did not call

Aguiar back, Aguiar would "go forward with proceeding with [Aguiar's] strategy . . . .");

exhibit 277 (insinuating to Mr. Cozzi that if Mr. Cozzi did not return Aguiar's call, Mr.

Cozzi's telephone calls would be recorded; stating that Aguiar "w[ould] f**king ratchet

this up . . .  to a level that [Mr.Cozzi] w[ould] be crying out in pain"; telling Mr. Cozzi that

if Mr. Cozzi did not call Aguiar back, Aguiar would show up at Mr. Cozzi's house);

exhibit 269 (stating in an email dated December 15, 2009 and sent to various

individuals including Mr. Cozzi, Kaplan and Natbony that "[Aguiar] w[ould] be holding

[some of the email recipients] accountable in every way" that "[t]his [wa]s not a

warning," that "[a]s of the close of business [some of the email recipient] w[ould] no

longer be able to hide because [Aguiar was] taking over everything including [their]

businesses," that "[t]his [wa]s an order that w[ould] result in the loss of sleep if there

[wa]s not an instant response" and that "[some of the email recipients] w[ould] find

themselves in a very bad place soon!!!"). Finally, when all else failed, Aguiar warned the

witnesses that there would be harmful consequences for their actions. See Exhibit 45

(advising Mr. Dar that the deadline to return Aguiar's telephone call had expired and

that there would be "severe repercussions" );exhibit 269 (stating in an email to

numerous recipients including Mark Cozzi and Bill Natbony, that "I [Aguiar] will be

holding you accountable in every way" and that "You can run but you can't hide . . . .

Judgment day is here."). Given Aguiar's cavalier attitude towards this lawsuit and

towards this Court, particularly with respect to intimidating witnesses, it is not a stretch,

especially in light of ample forensic evidence and Aguiar's own January 2010 emails

(exhibits 257 and 258) attaching confidential attorney-client communications originating

from Kaplan's AOL account, to find that Aguiar engaged in hacking in the instant case for the purpose of gaining a litigation advantage over Kaplan.

Aguiar argues, through the testimony of Dr. Duckworth,[39] that the most compelling reason for Aguiar to have hacked into the AOL account was Aguiar's concern for his own safety and the safety of his family. In conducting his investigation, Dr. Duckworth was prohibited by Aguiar's counsel from asking Aguiar or anyone else about the hacking: why Aguiar hacked into the AOL account, what email messages Aguiar viewed during the hacking and what Aguiar did with the information he gained from the hacking. Similarly, Dr. Duckworth could not ask Aguiar or anyone else about Aguiar's mood states at the time of each hacking, i.e. whether Aguiar was feeling paranoid or fearful.[40] The undersigned finds that given these significant limitations

_____

[39] Dr. Duckworth is a psychiatrist who testified on behalf of Aguiar during the evidentiary hearing. Dr. Duckworth spoke to and reviewed Aguiar's medical records from six treating or consulting physicians: Dr. Zipora Arison, Dr. Moti Mashiah, Dr. Adina Cohen, Dr. Alex Vuckovic, Dr. Harrison Pope and Dr. Matt Bernstein. In addition to the medical records, Dr. Duckworth interviewed Jamie Aguiar (Aguiar's wife), Ellen Aguiar (Aguiar's mother), Corey Drew (Aguiar's brother-in-law), Ygal Daniel and Moshe Flonis (members of Aguiar's security team), Jim McCarthy (a financial advisor) and Graydon Oliver (Aguiar's former employee and childhood friend). Dr. Duckworth also interviewed Aguiar a total of eight times. Dr. Duckworth's investigation was limited by Aguiar's invocation of the Fifth Amendment regarding Aguiar's hacking of Kaplan's AOL account. As a result, Dr. Duckworth was not able to ask Aguiar about his mental state at the time of each hacking or his intentions regarding the email hacking.

[40] In opining that Aguiar did not hack into the emails for purposes of gaining an advantage in this litigation, Dr. Duckworth testified that he looked for evidence that Aguiar gained some advantage from hacking into his uncle's account and evidence that he concealed it. Dr. Duckworth testified that in "[his] experience . . . people who are behaving in more antisocial-type behavior sequester information for their benefit or look to benefit from it." See Transcript, June 8, 2009 Evidentiary Hearing (DE# 393 at 78-79, 6/16/10). Dr. Duckworth concluded that Aguiar had not benefitted from his hacking. However, Dr. Duckworth was not allowed to ask Aguiar or anyone else about the hacking. Thus, Dr. Duckworth cannot state whether Aguiar gained an advantage from hacking into Kaplan's emails. Additionally, the undersigned finds that there is at least

37

placed on Dr. Duckworth by Aguiar's counsel, Dr. Duckworth could not have concluded within a reasonable degree of medical certainty that the reason Aguiar hacked into the AOL account was to protect himself and his family from Kaplan. Accordingly, the undersigned does not credit Dr. Duckworth's opinion that Aguiar was motivated by safety concerns when he hacked into Kaplan's AOL account.

Aguiar's conduct belies this argument. Aguiar claimed to be fearful of his uncle, yet he purposely flew to New York to confront Kaplan at a restaurant in the fall of 2009. Following, the confrontation Aguiar sent an antagonizing text message to Kaplan. See Exhibit 76. If Aguiar was truly fearful of Kaplan he would not send numerous emails insulting his uncle and alleging baseless claims regarding Kaplan being involved in a sex scandal and raping Aguiar's wife. Similarly, Aguiar claimed he feared that Kaplan's Chief of Security, Dusti Dar, would try to harm him, yet Aguiar left successive threatening messages on Mr. Dar's voicemail. See Exhibits 42, 45. Additionally, of the fourteen emails that generated read receipts, thirteen of them were from Kaplan's broker. There is no underlying personal safety justification for reading emails from Kaplan's broker. Thus, there is no credible evidence that Aguiar hacked into the AOL account in order to protect himself and his family. The undersigned finds that the more credible explanation for Aguiar's hacking activities, consistent with his pattern of witness intimidation, was a desire to gain an advantage "at all costs" in this litigation.

---

some evidence of Aguiar taking steps to avert detection. Notably, Aguiar was careful not to send emails from his PCIC email address directly to Kaplan, Natbony or other witnesses.

### B.     Defenses Raised by Aguiar

Before discussing what the appropriate sanctions should be for Aguiar's bad faith

hacking of Kaplan's AOL account, the undersigned will address the numerous defenses

raised by Aguiar. During these proceedings, Aguiar has raised a myriad of reasons why

the Court should not impose the "ultimate sanction" against him in the instant case.

Aguiar's defenses, which have developed over time, fall into the following three broad

categories: (1) Kaplan should have taken steps to prevent the hacking of his AOL

account; (2) Aguiar had a legal justification or legitimate reasons for hacking into

Kaplan's AOL account and (3) Kaplan had unclean hands. For the reasons stated

below, the undersigned finds that Aguiar's defenses are not legally cognizable or are

unsupported by the evidence in this case.

### i.      Kaplan Should Have Taken Steps to Prevent the Hacking of His AOL Account

With respect to the first category of defenses, at various times Aguiar's counsel

have argued that: (1) Kaplan's password was known to Aguiar; (2) Kaplan should have

taken steps to make his password harder to guess; (3) Kaplan should have changed his

password more often and (4) Kaplan should have used his company email instead of a

commercial email provider like AOL. The undersigned finds no factual support for the

argument that Aguiar knew Kaplan's password. At the October 23, 2009 evidentiary

hearing, Aguiar took the Fifth Amendment and refused to answer whether he knew

Kaplan's password. See Transcript, October 23, 2009 Evidentiary Hearing (DE# 186 at

57, 10/26/09). The record unequivocally shows that Kaplan did not share his password

with Aguiar, that Kaplan did not authorize Aguiar to log in to the AOL account and that

39

Kaplan did not know Aguiar had access to his AOL account until September 2009. Id. at 100, 112. The undersigned finds the remaining arguments, that Kaplan should have made the password harder to guess, that Kaplan should have changed his password more frequently and that Kaplan should have used his company email instead of a commercial email provider, unavailing. Kaplan kept his email password private and had a reasonable expectation of privacy in his AOL account. See In re Asia Global Crossings, Ltd., 322 B.R. 247, 256 (Bankr. S.D.N.Y. 2005) (noting that "[a]lthough e-mail communication, like any other form of communication, carries the risk of unauthorized disclosure, the prevailing view is that lawyers and clients may communicate confidential information through unencrypted e-mail with a reasonable expectation of confidentiality and privacy."). Aguiar was able to successfully gain access to Kaplan's AOL account by guessing the password, using special hacking software [41] or hiring a computer expert. Kaplan's purported shortcomings in failing to further secure his email do not in any way negate Aguiar's wrongful conduct.

### ii. Aguiar Had a Legal Justification or Legitimate Reasons for Hacking into Kaplan's AOL Account

Aguiar's counsel have raised a number of justifications for the hacking: (1) Aguiar hacked into the AOL account because he was afraid for his safety and the safety of his family; (2) Aguiar read Kaplan's emails because Kaplan threatened to reverse Aguiar's wife's conversion to Judaism and threatened the legitimacy of Aguiar's children; (3) it was legal under Israeli law for Aguiar to hack into Kaplan's AOL account; (4) Aguiar's

---

[41] The Leor parties' computer expert, Andrew Obuchowski, testified that there are a number of software programs that attempt to guess passwords. Aguiar could have gained access to the AOL account by employing this method.

actions in hacking into the AOL account are extraneous to this litigation (barroom brawl/snooping spouse argument) and (5) Aguiar's mental illness did not allow him to distinguish right from wrong, thus he did not appreciate the wrongfulness of his conduct.

With respect to the first argument, the undersigned has already determined that Aguiar was not motivated by safety concerns when he hacked into Kaplan's AOL account. See discussion, supra. The argument that Aguiar hacked into Kaplan's AOL account because Kaplan threatened to reverse Aguiar's wife's conversion to Judaism and threatened the legitimacy of Aguiar's children is not supported by the record. Additionally, even if there were some factual support for this proposed motivation, it is unclear how Aguiar's hacking of Kaplan's AOL account would remedy these alleged threats to Aguiar's wife and children. The undersigned is also unpersuaded by the argument that Aguiar's conduct was mitigated by the fact that hacking is sometimes legal under Israeli law. According to Aguiar, in Israel it is legal to access another's e-mail account if "the defendant or accused committed the infringement in good faith . . . in defense of a legitimate personal interest of the infringer." See Notice of Foreign Law Pursuant to F.R.C.P. 44.1 (DE# 244 at 1, 12/9/09). Aguiar states that this is a subjective standard. Id. Even if Israeli law is somehow applicable to these proceedings, Aguiar's argument fails because the undersigned has determined that Aguiar acted in subjective bad faith and for the improper purpose of gaining a litigation advantage in this case.

Aguiar further argues that the hacking has little or nothing to do with the litigation and analogizes the hacking to a barroom brawl between litigants or a divorce proceeding where one spouse engages in "snooping" in order to find evidence of martial infidelity. The undersigned is not persuaded by this argument. The record shows that

41

Aguiar's hacking was central to this case because Aguiar was motivated by a desire to gain a litigation advantage over Kaplan. Aguiar accessed Kaplan's emails on a continued basis from at least July 2009 until he was caught in September 2009. The undersigned believes that Aguiar would have continued "snooping" into Kaplan's email if he had not been caught. Many of the emails that Aguiar wrongfully accessed from the AOL account concern confidential attorney-client communications regarding the instant case. Aguiar has compromised the adversarial process and called into question the fundamental fairness of these proceedings. As Katten points out, Aguiar's hacking makes a mockery of the numerous informal discovery conferences the undersigned has presided over addressing the issue of attorney-client privilege. Aguiar has circumvented the privilege logs prepared by the parties. See Katten Muchin Rosenman LLP's Reply to Guma Aguiar's Opposition to Motion for Sanctions (DE# 73 at 4 n.3 in Case No. 09-60683, 10/1/09). Aguiar's actions are not tangential to this litigation. They strike at the heart of this litigation and are of great concern to this Court.

Lastly, Aguiar argues that the Court should not impose the "ultimate sanction" because he did not know right from wrong when he engaged in the hacking of Kaplan's AOL account. This argument is based on Dr. Duckworth's testimony that Aguiar was suffering from a severe manic episode from June 2009 until January 2010 and could not appreciate the wrongfulness of his conduct. However, Dr. Duckworth was not allowed to ask Aguiar whether he knew that hacking was illegal. Dr. Duckworth was prohibited by Aguiar's counsel from asking Aguiar or his secondary sources how Aguiar felt about hacking into Kaplan's AOL account. Dr. Duckworth was not allowed to ask Aguiar or

anyone else about Aguiar's state of mind at the times Aguiar engaged in hacking.[42] Because of the significant limitations placed on Dr. Duckworth by Aguiar's counsel, the undersigned disregards Dr. Duckworth's opinion[43] that Aguiar could not ascertain the wrongfulness of his conduct when hacking into the AOL account.

Moreover, the record contains evidence of Aguiar's ability to be calculating and deceitful. The undersigned notes that during his videotaped deposition on June 25, 2009, Aguiar was asked whether he had taped a telephone conversation with Kenton Holliday. Initially, Aguiar responded, "I did." See Exhibit 200 at 79. Aguiar then changed his testimony and stated "I wasn't taping it. Not at that point. I didn't think the tape recorder was working." Id. Aguiar then stated that "Shortly after -- after he [Kenton Holliday] asked me that question, he hung up the phone, and my other phone started ringing. And I went and answered my other phone. It was him. And I don't recall exactly what happened, but apparently the tape recorder was on the whole time. I thought it was off." Id. at 81. Later, Aguiar attempted to defend his actions by claiming that taping a telephone call was legal in Israel "if somebody calls you." Id. The undersigned finds that Aguiar has demonstrated an ability to differentiate between right and wrong despite

---

[42] Dr. Duckworth testified that an individual suffering from a manic episode can have periods of lucidity. In fact, Aguiar gave several television interviews during the relevant time period where he appeared normal. See, e.g., Exhibit 270 (August 25, 2009 video of Aguiar from Mike Huckabee's television show appearing normal); exhibit 275 (October 22, 2009 video of Aguiar being interviewed on the Sports Channel showing no outward appearance of a mental illness). Thus, Aguiar may have well been hacking into Kaplan's AOL account while in a period of lucidity.

[43] The undersigned finds that Dr. Duckworth is a credible and competent physician. However, given the significant limitations placed on Dr. Duckworth by Aguiar's counsel, the undersigned concludes that Dr. Duckworth could not have reached an opinion regarding Aguiar's ability to differentiate between right and wrong within a reasonable degree of medical certainty.

his bipolar disorder and psychosis. Therefore, this defense also fails.

### iii. Unclean Hands

Lastly, Aguiar has raised various arguments supporting his theory of unclean hands including the following: (1) Kaplan read Aguiar's emails through the receiver in Israel; (2) Kaplan's surveillance of Aguiar and his family caused Aguiar's mental condition to worsen which, in turn, caused Aguiar to hack into Kaplan's AOL account and (3) Kaplan used his lawyers to file lawsuits against Aguiar with the purpose of aggravating Aguiar's mental illness, which led to the hacking. "For a defendant to successfully avail [himself] of the doctrine of unclean hands, [he] must satisfy two requirements. First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted. Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that [he] was personally injured by [the plaintiff's] conduct." <u>Calloway v. Partners Nat. Health Plans</u>, 986 F.2d 446, 450-51 (11th Cir. 1993). Here, Aguiar cannot show that Kaplan's purportedly wrongful conduct is directly related to the hacking claim asserted against Aguiar. Additionally, there is no evidentiary support for Aguiar's unclean hands argument. Aguiar has failed to present any evidence that Kaplan unlawfully gained access to Aguiar's emails through the receiver in the Israeli proceedings against PCIC. The undersigned further finds that Kaplan's surveillance of Aguiar and his family and the filing of lawsuits[44] against Aguiar are insufficient to show unclean hands. The record

---

[44] In addition to the lawsuit initiated by Kaplan in this Court, Case No. 09-cv-60136-SEITZ/O'SULLIVAN, Kaplan filed a lawsuit against Aguiar and the Lillian Jean Kaplan Foundation (a charitable organization) in state court over Aguiar's distribution of donations made by Kaplan to the foundation.

establishes that Kaplan had good reason to keep Aguiar under surveillance. Additionally, there has been no showing that Kaplan engaged in a concerted effort to file frivolous lawsuits in order to goad Aguiar. For these reasons, Aguiar's unclean hands argument is not persuasive.

### C.    Lesser Sanctions Would Be Inadequate

"[I]inherent powers must be exercised with restraint and discretion . . . . A primary aspect of that discretion is the ability to fashion an appropriate sanction." Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) (internal citation omitted). The "dismissal of a party's complaint or answer, or striking its defenses . . . is a heavy punishment, appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." Eagle Hosp., 561 F.3d at 1306 (alterations and quotation marks omitted). Thus, in exercising its inherent power, the Court must consider whether a less severe remedy is more appropriate to address the misconduct at issue. See Betty K Agencies, LTD. v. M/V Monada, 432 F.3d 1333, 1338 (11th Cir. 2005); E.E.O.C. v. General Dynamics, 999 F.2d 113, 119 (5th Cir. 1993) (noting that the "death penalty" sanction of striking pleadings is appropriate "only under extreme circumstances" such as willfulness or bad faith).

Aguiar has proposed numerous alternatives to the dismissal of his claims and the striking of his defenses. Aguiar supports the creation of a "taint team" which would act as a buffer between Aguiar and his counsel.[45] The purpose of this taint team would be

---

[45] In closing arguments, Aguiar's counsel suggested that Aguiar replace his legal team with new counsel. See Transcript, June 9, 2010 Evidentiary Hearing (DE# 394 at 178-79, 6/16/10). However, in his proposed findings of fact and conclusions of law, Aguiar now suggests that his current counsel remain on the case. See Aguiar's Proposed Findings of Fact and Conclusions of Law in Opposition to Motion for

to ensure that Aguiar does not relay information obtained from Kaplan's privileged email communications to his counsel. If Aguiar attempts to provide information originating from Kaplan's emails, the taint team would notify the Court. The problem with this proposed remedy is that there is no way of determining what knowledge Aguiar gained as a result of reading Kaplan's privileged communications. Aguiar, like Dr. Gerst in Eagle Hospital, cannot unlearn the information he obtained from reading the emails in the AOL account. Accordingly, the taint team would be ill-equipped to differentiate between information originating from Aguiar and information originating from Aguiar's intrusions into Kaplan's email.

Aguiar also proposes restricting his access to computers and a "house arrest" of his own computer. However, there is no way for the Court to ensure Aguiar's compliance with such a restriction. Aguiar has already demonstrated a penchant for violating the Court's orders. See Contempt Motion, discussed infra. Moreover, Aguiar travels frequently and can easily access a computer from anywhere in the world. Additionally, this proposed sanction does not address the knowledge obtained by Aguiar from reading Kaplan's emails.

Aguiar further proposes that, upon a motion by Kaplan, he be required to show that challenged information is derived from an independent source. The problem with this proposed remedy is that even if Aguiar can show an independent basis for the challenged information, it does not eliminate the question of how this information was originally obtained. Aguiar may, after the fact, find independent sources for information

---

Sanctions and Motion for Contempt (DE# 396-1 at 99-100, 6/21/10). The undersigned finds for the reasons discussed above that the "taint team" suggestion is not a workable solution in the instant case with new or existing counsel.

he originally obtained from reading Kaplan's emails.

Aguiar also offers to pay for the costs of moving Kaplan's emails to a secure email server at Tigris. This proposed alternative sanction is inadequate because Aguiar has shown as late as January 2010 that he has retained possession of at least some of Kaplan's confidential email communications. See Exhibits 310 and 311.

Lastly, Aguiar suggests that the Court may consider reimbursing Kaplan for the costs associated with the hacking.[46] This sanction would be inadequate because it would not address the unfair advantage Aguiar gained from hacking into Kaplan's emails.

Additionally, imposing any or all of these proposed sanctions on Aguiar would convey a message to future litigants that they have everything to gain with relatively little to lose from obtaining an opposing party's confidential attorney-client communications. See Eagle Hosp., 561 F.3d at 1306 (noting that the district court considered the deterrent effect on future litigants in determination what appropriate sanctions to impose for abuse of the judicial process). For these reasons, the undersigned finds that these alternative sanctions are inadequate to remedy the substantial doubt cast on the fairness of these proceedings by Aguiar's unauthorized access of confidential attorney-client communications.

In light of the undersigned's finding that Aguiar willfully gained unauthorized access to his uncle's email account and had access to hundreds of privileged emails

---

[46] The Leor parties also seek "the imposition of monetary fines or penalties" in their motion for sanctions. See Motion for Sanctions Against Guma Aguiar (DE# 135 at 11, 10/1/09). The undersigned recommends that this request be denied since the dismissal of Aguiar's claims and the striking of his defenses adequately redress Aguiar's misconduct.

containing opposing counsel's confidential client communications, mental impressions, thought processes, legal recommendations and trial strategy, the undersigned concludes that no lesser sanction than the dismissal of Aguiar's claims and the striking of his defenses would be appropriate in the instant case. See In re Grand Jury Investigation, 599 F.2d 1224, 1231 (3rd Cir. 1979) (noting that pure legal opinion "is the most sacrosanct of all forms of work product."). The purpose of the work-product doctrine is to "shelter[ ] the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975). By "protecting 'the attorney's thought processes and legal recommendations' from the prying eyes of his or her opponent," the doctrine "promotes a fair and efficient adversarial system . . . ." In re EchoStar Commc'ns Corp., 448 F.3d 1294, 1301 (Fed. Cir. 2006) (quoting Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997)). The sensitive communications that Aguiar gained access to are at the crux of the adversarial system. By prying into Kaplan's communications with his attorneys and with Natbony, Aguiar has gained an unfair advantage in this litigation. Accordingly, the undersigned finds that no lesser sanctions can be imposed that would remedy the damage caused by Aguiar's hacking.

## II.    Corrected Motion to Hold Guma Aguiar in Contempt

In addition to their motion for sanctions, the Leor parties request that the Court find Aguiar in civil contempt [47] for violating the Court's Order prohibiting witness

---

[47] "The conclusive, most important factor in distinguishing [between] civil and criminal contempt is the purpose of the contempt judgment. If its purposes is to coerce the contemnor into compliance with the court's order or to compensate the complainant for losses sustained, then the proceeding is civil. On the other hand, if its purpose is to punish or to vindicate the authority of the court, then the proceeding is criminal." In re

48

intimidation,[48] that Aguiar be referred to the United States Attorney's Office for criminal contempt prosecution and that the Court award the Leor parties attorney's fees and costs resulting from Aguiar's wrongful conduct. See Corrected Motion to Hold Guma Aguiar in Contempt (DE# 228 at 15, 12/2/09).[49] A district court's power to find a party in civil contempt for disobeying court orders stems from its inherent power to enforce compliance with its lawful orders. Citronelle-Mobile Gaterhin, Inc. v. Watkins, 943 F.2d 1297, 1301 (11th Cir. 1991). To prevail on a motion for civil contempt, the moving party must demonstrate by clear and convincing evidence that the offending party has violated an outstanding court order. Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc., 950 F.2d 1525, 1529 (11th Cir. 1992); Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002) (noting that "[a] finding of civil contempt – willful disregard of the authority of the court – must be supported by clear and convincing evidence."). Civil contempt is appropriate upon a finding that: "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." Riccard, 307 F.3d at 1296. "Once it has been shown that a violation of the order has occurred, the burden

---

Dinnan, 625 F.2d 1146, 1149 (5th Cir. 1980) (citations omitted).

[48] Although the Motion for Contempt (DE# 228) refers to multiple Orders that the Leor parties allege Aguiar has violated, see Orders (DE# 158,10/9/09; DE# 189, 10/27/09 and DE# 199, 11/2/09), the only Order that the Leor parties have shown, by clear and convincing evidence, was violated by Aguiar is the June 22, 2009 Order (DE# 88).

[49] Leor seeks to hold Aguiar in civil contempt to ensure Aguiar's compliance with the Court's Order prohibiting the intimidation of witnesses. Some of the conduct cited by the Leor parties in their motion for contempt occurred prior to the Court's June 22, 2009 Order (DE# 88). Although Aguiar's pre-June 22, 2009 conduct is relevant to the motion for sanctions, the undersigned will not rely on it in addressing the contempt motion.

shifts to the contemnor to demonstrate an impossibility of compliance." In re Lawrence, 279 F.3d 1294, 1299 (11th Cir. 2002). The Eleventh Circuit has made clear that "[d]istrict courts have broad discretion in fashioning civil contempt sanctions." Howard Johnson Co., Inc. v. Khimani, 892 F.2d 1512, 1519 (11th Cir. 1990). Generally, sanctions for civil contempt serve two purposes: (1) to coerce the contemnor into compliance with the Court's order; and (2) to compensate the complainant for losses sustained as a result of the contumacious behavior. United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947). In addition to compensatory damages and a fine to coerce compliance payable to the complainant, attorneys' fees and expenses may be awarded. Sizzler Family Steak Houses v. Western Sizzlin Steak, 793 F.2d 1529, 1534 (11th Cir. 1986).

On June 22, 2009, the Court entered an Order[50] "enjoin[ing Aguiar] from witness intimidation including prohibiting Mr. Aguiar or anyone on his behalf from coming within twenty (20) feet of witnesses Thomas Kaplan, Dafna Kaplan, Jason Kaplan, Patricia Kaplan, William Natbony, Theresa Hilliard, Kenton Holliday . . . or their spouses or children, except in the presence of counsel or with the witness' prior written authorization." See Order (DE# 88, 6/22/09).[51] The June 22, 2009 Order (DE# 88) was valid and lawful. The Court has the authority to protect litigants and witnesses in this case from intimidation and harassment. See Kleiner v. First Nat. Bank of Atlanta, 751

---

[50] A similar order was not entered in Case No. 09-60683-CIV-SEITZ/O'SULLIVAN because the Leor parties' Motion for an Order to Prevent Defendant Guma Aguiar's Further Witness Tampering (DE# 55, 5/15/09) was filed only in Case No. 09-60136-CIV-SEITZ/O'SULLIVAN.

[51] The Court's Order (DE# 88) did not make factual findings regarding Aguiar's conduct. See Order (DE# 88, 6/22/09).

F.2d 1193, 1209 (11th Cir. 1985) (noting that "[c]ourts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal."). The June 22, 2009 Order was clear and unambiguous in that it prohibited Aguiar "from witness intimidation including prohibiting Mr. Aguiar or anyone on his behalf from coming within twenty (20) feet of witnesses Thomas Kaplan [and] Dafna Kaplan. . . except in the presence of counsel or with the witness' prior written authorization." See Order (DE# 88, 6/22/09). The Leor parties have shown by clear and convincing evidence that Aguiar, in blatant disregard of the Court's Order (DE# 88), confronted Kaplan and his wife at a restaurant in New York City in November 2009.[52] Aguiar has not shown that the confrontation took place in the presence of counsel or that Kaplan had authorized the encounter. Following the confrontation at the restaurant, Aguiar sent Kaplan an intimidating text message. The text message states as follows:

> Nice move to the "boys" for trying to frame Guma today. . . to[o] bad their intelligence is worse that his counter intelligence which he had to install because of the lies under oath in front of numerous judges around the world! He has had to endure death threats[,] assassination attempts, cover ups, stalking of his family including kids, sisters, mom, brother[,] grandparents and HIS wife!!! [F]inally they broke GUMA'S mother f***ing back!!! They will ALL be exposed along with Harley, Tucker, Dutsi, Patricia, Jason, Leib and Bill . . . **oh, I[']ll happily turn over ALL my photos of [D]aphne [Kaplan's wife], Little Leandro and Leorianee [Kaplan's children]!!!!!**

See Exhibit 76 (capitalization and punctuation in original) (emphasis added).[53]

---

[52] Aguiar's emails to Theresa Hilliard also violate the Court's June 22, 2009 Order (DE# 88) prohibiting witness intimidation. However, the undersigned will focus on Aguiar's most flagrant violation of the Order (DE# 88), when he confronted Kaplan and his wife at the restaurant in New York City.

[53] At the evidentiary hearing, Leor argued that turning over or covering photographs of the deceased is a Jewish tradition. However, no testimony was presented to support this argument.

The undersigned finds that Aguiar had the ability to comply with the June 22, 2009 Order (DE# 88).[54] Aguiar could have easily avoided being within 20 feet of Kaplan or Kaplan's wife, yet he purposely flew to New York City and went to a restaurant where he knew Kaplan would be dining for the sole purpose of confronting Kaplan. There is no evidence that Aguiar made good faith, reasonable efforts to comply with the June 22, 2009 Order (DE# 88). "[T]he inability that will absolve a party from being held in contempt requires . . . that the noncomplying party has made in good faith all reasonable efforts to comply with the terms of a court order." Chairs v. Burgess, 143 F.3d 1432, 1437 (11th Cir. 1998) (internal citations and quotation marks omitted). For these reasons, Aguiar is in contempt of the Court's June 22, 2009 Order (DE# 88).

Although Aguiar's conduct is contemptible, the undersigned finds that the striking of Aguiar's defenses in Case No. 09-60136-CIV-SEITZ/O'SULLIVAN and the dismissal of Aguiar's claims in Case No. 09-60683-CIV-SEITZ/O'SULLIVAN are sufficient to redress Aguiar's actions and prevent future witness intimidation by Aguiar. The Court has broad discretion in fashioning a remedy when a party is in contempt of Court. Shillitani v. United States, 384 U.S. 364, 370 (1966) (noting "that there can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."). Accordingly, the Leor parties' request for an order awarding attorney's fees and costs and referring Aguiar for criminal contempt proceedings should

---

[54]  Dr. Duckworth, Aguiar's expert, opined that Aguiar could not conform his behavior despite the Court's admonishments. However because of the significant restrictions placed on Dr. Duckworth by Aguiar's counsel, see supra, the undersigned finds that Dr. Duckworth could not have rendered an opinion, within a reasonable degree of medical certainty, regarding Aguiar's ability to comply with the Court's Order (DE# 88) prohibiting the intimidation of witnesses.

be denied.

## CONCLUSION

The federal courts have the inherent power to punish conduct that abuses the judicial process. In the instant case, Aguiar hacked into Kaplan's AOL account with the bad faith intent to gain an advantage in this litigation. As a result of Aguiar's wrongful hacking, Aguiar gained access to Kaplan's confidential attorney-client communications regarding this litigation and continues to have access to at least some of these privileged materials. The Leor parties and Katten have been severely prejudiced by Aguiar's actions and Aguiar's actions have undermined the adversarial process and the fairness of these proceedings. The imposition of lesser sanctions would be inadequate to remedy Aguiar's transgression because Aguiar cannot unlearn the information that he has wrongfully obtained. Accordingly, the undersigned recommends that the Leor parties' Motion for Sanctions Against Guma Aguiar (DE# 135 in Case No. 09-60136, 10/1/09) be granted and that the Court impose the "ultimate sanction" by dismissing Aguiar's claims and striking his defenses. The undersigned further finds that Aguiar engaged in witness intimidation in violation of the Court's prior Order (DE# 88, 6/22/09). The undersigned recommends that Aguiar be held in contempt. The undersigned finds that the imposition of the "ultimate sanction" is sufficient to redress Aguiar's contempt and does not recommend that attorney's fees and costs be assessed against Aguiar or that Aguiar be referred for criminal contempt prosecution.

## RECOMMENDATION

In accordance with the foregoing Report and Recommendation, it is respectfully **RECOMMENDED** that the Motion for Sanctions Against Guma Aguiar (DE# 135 in

Case No. 09-60136, DE# 51 in Case No. 09-60683, 10/1/09) be **GRANTED** and that the

Corrected Motion to Hold Guma Aguiar in Contempt (DE# 228 in Case No. 09-60136,

12/2/09; DE# 126 in Case No. 09-60683, 12/3/09) be **GRANTED in part and DENIED**

**in part**. The undersigned further recommends that the Court enter an Order finding

Aguiar in contempt of the Court's Order (DE# 88, 6/22/09), dismissing Aguiar's claims in

Case No. 09-60683-CIV-SEITZ/O'SULLIVAN and striking his defenses in No. 09-60136-

CIV-SEITZ/O'SULLIVAN.

The parties have fourteen (14) days from the date of receipt of this Report and

Recommendation within which to serve and file written objections, if any, with the

Honorable Patricia A. Seitz, United States District Judge. Failure to file timely objections

shall bar the parties from attacking on appeal the factual findings contained herein.

LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958, 109 S.

Ct. 397 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

RESPECTFULLY SUBMITTED at the United States Courthouse in Miami,

Florida, **29th** day of June, 2010.

JOHN  J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Seitz
All Counsel of Record

54