## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

LEOR EXPLORATION &
PRODUCTION, LLC, *et al.,*

                                CASE NO. 09-60136-CIV-SEITZ/O'SULLIVAN

          Plaintiffs,

v.

GUMA AGUIAR,

          Defendant.

_____/

GUMA AGUIAR,

                                CASE NO. 09-60683-CIV-SEITZ/O'SULLIVAN

          Plaintiff,

v.

WILLIAM NATBONY, *et al.,*

          Defendants.

_____/

## ORDER ADOPTING IN PART REPORT AND RECOMMENDATION AND STRIKING PLEADINGS

THIS MATTER is before the Court on the Leor Parties'[1] Motion for Sanctions Against

Guma Aguiar [DE-135 in case no. 09-60136 and DE-51 in case no. 09-60683] and the Leor

Parties' Corrected Motion to Hold Guma Aguiar in Contempt [DE-228 in case no 09-60136 and

DE-126 in case no. 09-60683]. The Motions were referred to Magistrate Judge O'Sullivan, who

held evidentiary hearings on October 23 and 26, 2009, December 4, 2009, and June 7 through 9,

2010. Thereafter, he issued his Report and Recommendation (Report) [DE-400 in case no. 09-

---

[1]The Leor Parties' are the Plaintiffs in case no. 09-60136, Leor Exploration & Production, LLC, Pardus Petroleum, LP, Pardus Petroleum, LLC, and William Natbony, and the Defendants in case no. 09-60683, William Natbony, Thomas Kaplan, Katten Muchin Rosenman, LLP, and Pardus Petroleum, LP.

60136 and DE-280 in case no. 09-60683], which recommends granting the Motion for Sanctions and granting in part the Motion to Hold Guma Aguiar in Contempt. The Report further recommends that as sanctions, and as contempt sanctions, Guma Aguiar's pleadings be stricken in both cases. Specifically, the Report recommends that Aguiar's answer and defenses in case no. 09-60136 be stricken[2] and Aguiar's claims in case no. 09-60683 be stricken. Both sides have filed Objections to the Report. Because Aguiar has been sufficiently sanctioned, the Leor Parties' Objection, based on the Magistrate Judge's failure to recommend that the Leor Parties' request for fees and costs be granted, is overruled. Because the Leor Parties have shown by clear and convincing evidence that Aguiar violated Judge O'Sullivan's orders and that Aguiar gained unauthorized access to Kaplan's emails in order to gain a litigation advantage, Aguiar's objections are overruled and the Report is affirmed and adopted, with the exception of the finding that the restaurant incident violated the Court's order.

## I. Introduction

This case arises from the disintegration of a family and business relationship between Thomas Kaplan, one of the Leor Parties, and his nephew, Guma Aguiar. Very briefly, Kaplan founded Leor Exploration & Production, LLC (Leor) and installed Aguiar as its Chief Executive Officer. Leor ultimately sold nearly all of its assets to EnCana Oil & Gas, Inc. (EnCana) for $2.55 billion. Thereafter, disputes arose between Aguiar and Kaplan over how much money Aguiar was owed after the asset sale and how Aguiar managed Leor before and after the asset

---

[2]The Report actually recommends that Aguiar's defenses in case no. 09-60136 be stricken. However, after entering the Report, the Magistrate Judge entered an order granting the Leor Parties' Motion for Clarification [DE- 408 in case no. 09-60136 and DE-285 in case no. 09-60683], in which the Magistrate Judge recommended that Aguiar's defenses *and answer* be stricken in case no. 09-60136.

sale. The disputes have also turned personal. As a result, numerous lawsuits have ensued, including, but not limited to, these two cases,[3] a lawsuit in Texas state court, a lawsuit in Broward County court, and a newly filed suit by Aguiar's mother against Thomas Kaplan and others.

In the two instant cases, problems arose soon after the cases were filed. The Leor Parties began complaining of improper intimidation of potential witnesses by Aguiar. The Leor Parties first brought such issues to the Court's attention when they filed their Notice of Filing Declaration of Laurel Bond on April 2, 2009. *See* DE-38-1 in case no. 09-60136. On May 15, 2009, the Leor Parties filed a Motion for an Order to Prevent Defendant Guma Aguiar's Further Witness Tampering [DE-55 in case no. 09-60136]. Magistrate Judge O'Sullivan granted the Motion on June 22, 2009. The order granting the Motion enjoined Aguiar from intimidating witnesses and prohibited Aguiar, or anyone on his behalf, from coming within twenty feet of Thomas Kaplan, Dafna Kaplan,[4] Jason Kaplan,[5] Patricia Kaplan,[6] William Natbony,[7] Theresa

---

[3]Case no. 09-60136 was filed on January 1, 2009. Case no. 09-60683 was filed on March 26, 2009 in state court and was removed to this Court on May 11, 2009.

[4]Dafna Kaplan is Thomas Kaplan's wife.

[5]Jason Kaplan, also referred to as Jay Kaplan, is Thomas Kaplan's father.

[6]Patricia Kaplan is Jason Kaplan's wife and Thomas Kaplan's step-mother.

[7]William Natbony is one of the Leor Parties. He was a partner at Katten Muchin Rosenman and, as such, handled many of Kaplan's legal disputes. In May 2007, Natbony left Katten to become Chief Executive Officer of one of Kaplan's companies.

3

Hilliard,[8] Kenton Holliday,[9] Garret Smith,[10] Rabbi Lieb Tropper,[11] Rabbi David Jacobs[12] or their spouses or children, except in the presence of counsel or with the witnesses' prior written authorization. *See* DE-88 in case no. 09-60136. Subsequently, more specific motions followed and the Magistrate Judge entered additional orders to prevent witness tampering. *See* DE-158, 189, 199 in case no. 09-60136. Ultimately, on December 2, 2009, the Leor Parties filed their Corrected Motion to Hold Guma Aguiar in Contempt [DE-228 in case no. 09-60136],[13] based on Aguiar's violation of the orders enjoining witness tampering.

In early September 2009, additional problems arose when Kaplan learned that someone had hacked into, or gained unauthorized access to, his main email account, which contained over 45,000 emails. The hacker gained access to, among other things, numerous attorney-client privileged communications concerning this case and the other disputes between Aguiar and Kaplan.[14] Kaplan learned about the hacking when people with whom he corresponds via email

---

[8]Theresa Hilliard was the Comptroller of Leor from September 2005 until December 31, 2008.

[9]Kenton Holliday is the President of Leor and has held that position since March 2006.

[10]Garret Smith was Vice President and In-House General Counsel for Leor.

[11]Rabbi Lieb Tropper is not involved in Leor. However, it appears that he has had many interactions with both Aguiar and Kaplan.

[12]Rabbi David Jacobs is also not involved in Leor. However, it appears that he has had many interactions with both Aguiar and Kaplan.

[13]The original Motion to Hold Guma Aguiar in Contempt [DE-220] was filed on November 30, 2009.

[14]Kaplan's computer expert testified that it is likely that the hacker not only accessed the emails but also copied the emails, which would give the hacker access to the emails without having to re-access Kaplan's email account. *See* Transcript of October 26, 2009 Evidentiary Hearing at 57-62.

4

received "read receipts" for emails that had been sent to Kaplan. The read receipts did not come from Kaplan's email account, thereby alerting the sender that someone had read the email other than Kaplan.

The Leor Parties have a joint litigation agreement. Therefore, the hacking of the confidential communications affected all of the Leor Parties. Believing that Aguiar, or someone acting under his direction, was responsible for the hacking, on October 1, 2009, the Leor Parties filed their Motion for Sanctions Against Guma Aguiar and for Expedited Evidentiary Hearing [DE-135 in case no. 09-60136 and DE-51 in case no. 09-60683]. The Magistrate Judge held evidentiary hearings on the Motion for Sanctions on October 23 and 24, 2009 and on December 4, 2009. The evidentiary hearings in June 2010 addressed both the Motion for Sanctions and the Motion to Hold Guma Aguiar in Contempt.

As a result of the filing of the Motion for Sanctions, the litigation of the claims in these two cases came to a halt. In both cases, the Court entered an order staying discovery, with the exception of limited discovery for the purposes of the Motion for Sanctions, until resolution of the Motion for Sanctions. *See* DE-190 in case no. 09-60136. The Court also suspended all pretrial deadlines in both cases. *See* DE-197 in case no. 09-60136. Aguiar's counsel then sought a lengthy extension of time to respond to filings by the Leor Parties because Aguiar was unavailable to work with counsel because of his mental health. As a result, the Magistrate Judge was unable to conclude the evidentiary hearings until June 2010. Thus, Aguiar's actions, which caused the Leor Parties to file their Motions, have led to a more than nine-month delay of the proceedings in these cases.

After completion of the evidentiary hearings in June 2010, the Magistrate Judge issued his Report and Recommendation. During the evidentiary hearings, Aguiar, asserting his Fifth Amendment right, refused to answer any questions about the hacking or about his access to Kaplan's email account and Aguiar refused to turn over his computer for inspection.[15] However, Aguiar did offer some testimony, which the Magistrate Judge found not credible after observing Aguiar's mannerisms and demeanor and noting that Aguiar had lied in other instances in this case. *See* Report at notes 22 & 32. Additionally, both sides presented computer experts who testified about the hacking – how it could have been done, who likely did it, and from where it was done. The Magistrate Judge also heard testimony from experts regarding Aguiar's mental state and whether Aguiar had the capacity to form the requisite intent for the imposition of sanctions under the Court's inherent power. Finding that Aguiar was responsible for the hacking, the Magistrate Judge concluded that Aguiar had acted in bad faith and recommended that Aguiar's pleadings in both cases be stricken as sanctions for the hacking. The Report also concluded that Aguiar had violated the Court's witness tampering orders and that striking Aguiar's pleadings was also a sufficient sanction for Aguiar's contempt. Thus, the Magistrate Judge recommended that the Leor Parties' Motion to Hold Guma Aguiar in Contempt be denied in part because he did not recommend that the Leor Parties be awarded their attorneys' fees and costs.

---

[15]Despite the issuance of a Court order requiring Aguiar to turn over to Kaplan's counsel all computers and all computer records associated with PCIC, and several specific email addresses, Aguiar did not comply with the order and, instead filed a document with the Court indicating that he would not comply because he was asserting his rights under the Fourth, Fifth, and Sixth Amendments. *See* Report at note 33.

The relevant facts in this matter are extremely lengthy and have been set out in great detail, with citations to the record, in the Magistrate Judge's Report. Therefore, the Court will not restate them here. Having conducted a *de novo* review of the record, the Court finds that the Magistrate Judge's findings of fact are more than amply supported by the record, with a single small exception noted below. While the Court will address all of Aguiar's objections to the findings of fact, the Magistrate Judge's findings of fact are adopted herein, with the exception of some of the facts relating to the restaurant incident, as more fully discussed in section II.A.1.

## II. Aguiar's Objections

Aguiar has filed numerous objections to the Report. The objections can be broken down into three categories: (1) objections to specific factual findings; (2) objections to particular procedural decisions; and (3) objections to legal conclusions. The Court will address each of these categories of objections in order.

### A.  The Objections to Factual Findings

Aguiar raises the following five objections to the Magistrate Judge's factual findings: (1) Aguiar's visit to the restaurant in New York is unsupported by the factual record; (2) the Magistrate Judge erred by concluding that Aguiar did not have Kaplan's email password; (3) it was error to conclude that access to Kaplan's email was for litigation, not security, purposes; (4) it was error to conclude that the read receipts originated from an email account maintained by Aguiar; and (5) the Report ignores proof that Kaplan engaged in a concerted effort to goad Aguiar by filing frivolous lawsuits. With the exception of Aguiar's first objection, Aguiar's objections to the Magistrate Judge's factual findings are without merit.

7

### 1. The Visit to the New York Restaurant is Not Wholly Unsupported By the Record

Aguiar first argues that the Magistrate Judge erred by relying on an incident for which

there is no record evidence, namely, Aguiar's alleged visit to a New York restaurant where he

confronted Kaplan and his wife, who were dining there.  Aguiar asserts that the Magistrate Judge

heavily relied on this incident to establish that Aguiar had violated the Court's order prohibiting

witness intimidation  and to establish that Aguiar had a win-at-all-costs attitude with regard to

this litigation.  In response, the Leor Parties point out that both Kaplan and Aguiar's head of

security, Zafrir Pazi, testified about the incident and that it is not the only incident involving

Aguiar that the Magistrate Judge found had violated the witness intimidation order.

While both Kaplan and Pazi mentioned the incident during their testimony, neither

testified about it in enough detail to determine whether Aguiar had actually violated the Court's

order, which required Aguiar to stay 20 feet away from Kaplan.  *See* Transcript of June 9, 2010

Evidentiary Hearing at 55-56 (Kaplan testimony); Transcript of December 4, 2009 Evidentiary

Hearing at 140 (Pazi testimony).  However, the Report noted at least one other set of

circumstances that establish that Aguiar violated the Court's order, Aguiar's emails to Theresa

Hilliard.  *See* Exs. 260-266.  Aguiar does not object to that finding.  In fact, he does not mention

it in his objections.  In addition to the threatening and disturbing emails sent to Hilliard, Aguiar

also left a long voicemail on Hilliard's cell phone that was indiscernible and in which he was

aggressive, angry, and shouting.  *See* Transcript of June 7, 2010 Evidentiary Hearing at 151-152.

Thus, there is clear and convincing record evidence to establish that Aguiar violated the Court's

order and to find Aguiar in contempt, even without consideration of the restaurant incident.

Aguiar also argues that the Report relies on the restaurant incident to establish that the hacking was related to this litigation and that Aguiar had a win-at-all-costs attitude toward this litigation. Contrary to Aguiar's assertion, the Report contains numerous incidents that support the Magistrate Judge's conclusion that Aguiar had a win-at-all-costs mentality, including Aguiar's attempt to bribe Kenton Holliday to help Aguiar obtain 50% of the proceeds of the sale of Leor to EnCana;[16] Aguiar's recording of a phone conversation with Holliday and lying about it; Aguiar's threatening emails to Mark Cozzi;[17] and Aguiar's emails to Theresa Hilliard. Thus, even without reliance on the restaurant incident, the record contains clear and convincing evidence that supports the Magistrate Judge's conclusions as to Aguiar's win-at-all-costs attitude.

### 2. The Unrebutted Record Evidence Establishes that Kaplan Did Not Give Aguiar His Email Password

Second, Aguiar argues that the Magistrate Judge erred by concluding that Aguiar did not have Kaplan's email password. Contrary to Aguiar's assertions, Kaplan unequivocally testified that he did not give Aguiar his password. *See* Transcript of October 23, 2009 Evidentiary Hearing at 100, 112, 114. Furthermore, no evidence was presented to contradict Kaplan's testimony. Nor was any evidence presented that if Aguiar had Kaplan's password that Aguiar had authority to use it. Consequently, the record supports the Magistrate Judge's conclusion and this objection is overruled.

---

[16]Holliday testified that after Aguiar was fired from Leor he called Holliday and offered Holliday "a piece of the proceeds" if Holliday would help Aguiar in his pursuit of 50% of the proceeds from the EnCana sale. Transcript of June 7, 2010 Evidentiary Hearing at 97-98. Holliday understood this offer as an attempt to bribe him. *Id.* at 98.

[17]Mark Cozzi was the Executive Vice President and Chief Financial Officer of Leor from April 1, 2005 until June 30, 2007, when he resigned. He continued working with Leor in a consulting capacity from July 1, 2007 until December 31, 2007.

### 3. Aguiar Hacked Kaplan's Email Account to Gain a Litigation Advantage

Aguiar's third factual objection asserts that it was error to conclude that Aguiar accessed Kaplan's email account for litigation purposes, instead of security purposes. Aguiar argues that (1) the Leor Parties have not presented clear and convincing evidence that Aguiar's reason for hacking Kaplan's email account was to gain a litigation advantage; (2) the Magistrate Judge ignored substantial evidence of Aguiar's security concerns; (3) Aguiar and Kaplan have multiple disputes, personal as well as these and other lawsuits, and that the items on the privilege log submitted by the Leor Parties pertain more to the other disputes than this one; (4) there is no evidence that Aguiar ever attempted to use any of the hacked emails in this litigation; and (5) there is nothing wrong with wanting to win this lawsuit. The Leor Parties respond by pointing out that there is substantial evidence supporting the finding that Aguiar had a win-at-all-costs mentality and that there is no credible record evidence supporting Aguiar's claim that the hacking was based solely on Aguiar's security concerns. The Leor Parties also note that there is no evidence that Kaplan ever actually physically threatened Aguiar and that there is evidence that contradicts Aguiar's alleged fear of Kaplan.

As set out in the Report, there is clear and convincing evidence that Aguiar had a win-at-all-costs mentality regarding this litigation. Moreover, because Aguiar invoked his Fifth Amendment right and Dr. Duckworth[18] was prohibited from any type of inquiry relating to the hacking, there is no evidence directly addressing Aguiar's motivation for the hacking. While Dr. Duckworth testified that he believed that the hacking was motivated solely by Aguiar's safety

---

[18]Dr. Duckworth is Aguiar's psychiatric expert who testified regarding Aguiar's mental state during the relevant time periods.

concerns, his conclusions about the hacking were colored by the limitations placed on him by Aguiar's counsel.  Dr. Resnick[19] explained how these limitations make it impossible to reach a conclusion within a reasonable degree of medical certainty; he also explained that the limitations made it impossible to rule out other reasons for Aguiar's hacking.  Transcript of June 8, 2010 Evidentiary Hearing at 180, 185-86, 188, 229, 233.  Furthermore, while there is no evidence that Aguiar actually used any of the information in the emails in this litigation, other than forwarding the contents of many emails to his attorneys, there is also no evidence that he has not and there is nothing stopping him from using the information as the litigation progresses.  Finally, while there is nothing wrong with wanting to win, there is something wrong with doing anything, whether legal or not, to win.  Consequently, this objection is overruled.

### 4. The Record Supports the Conclusion that the Read Receipts Came from an Email Account Maintained by Aguiar

Aguiar's next objects to the Magistrate Judge's conclusion that the read receipts originated from an email account maintained by Aguiar.  Specifically, the Report found that the fourteen read receipts received by Kaplan, which alerted him to the hacking or unauthorized access to his email account, were generated by the email account guma@mail.pcic.co.il which was controlled by Aguiar.  Aguiar asserts that the evidence strongly supports the conclusion that the read receipts may have been "spoofed," or faked, and that Aguiar testified that he had never heard of the guma@mail.pcic.co.il email account (the PCIC account).[20]  Further, the Leor Parties'

---

[19]Dr. Resnick is the Leor Parties' psychiatric expert who testified regarding bipolar disorder in general and the methodology used by Dr. Duckworth in conducting his investigation of Aguiar's mental state.

[20]As noted earlier, the Magistrate Judge did not find this testimony credible.

expert was unable to fully explain why only fourteen read receipts were generated and sent out. Thus, Aguiar argues that the Report improperly concluded that Aguiar's improper access of Kaplan's email led to the generation of the read receipts.

In response, the Leor Parties point out that undisputed evidence shows that Aguiar had unauthorized access to Kaplan's emails and forwarded a compilation of some of those emails to Aguiar's counsel and others on January 8 and 9, 2010. The Leor Parties further argue that while both sides' computer experts testified that the read receipts could be spoofed, neither expert actually stated that in his opinion the read receipts had been spoofed and, in fact, the Leor Parties' expert believed that the read receipts were authentic.

First, the Court notes that whether the read receipts came from an account controlled by Aguiar or not is not central to finding that Aguiar accessed Kaplan's email account without authorization. The undisputed evidence establishes that Aguiar had in his possession emails from Kaplan's account and actually forwarded some of those emails to counsel and others. This evidence alone establishes that Aguiar, or someone acting on his behalf, accessed Kaplan's email account. Second, contrary to Aguiar's assertions, the evidence does not support, let alone strongly support, the conclusion that the read receipts were spoofed. Neither expert testified that they believed that the read receipts had been spoofed and the Leor Parties' expert offered reasonable explanations for the alleged "red flags" in the read receipts, including why only fourteen read receipts were generated. *See* Transcript of December 29, 2009 Evidentiary Hearing at 83, 85-86. Thus, the evidence supports that the read receipts were generated by the PCIC account.

Last, the Magistrate Judge concluded that the PCIC account was controlled by Aguiar based on adverse inferences made after Aguiar asserted his Fifth Amendment right when asked about the PCIC account and when the Leor Parties sought to search Aguiar's computer and obtain information from PCIC. Aguiar does not actually object to the propriety of making the adverse inferences. In fact, Aguiar tacitly admits that, in a civil case, the law permits a court to make adverse inferences if a party invokes his Fifth Amendment right. Instead of objecting to the legality of making the adverse inferences, Aguiar, without record support, simply asserts that the inferences in this case are particularly weak. However, the Report is based on more than just adverse inferences; it sets out ample record evidence to support the Magistrate Judge's conclusion. Consequently, the Court finds that the Magistrate Judge did not err in finding that Aguiar gained unauthorized access to Kaplan's email account and that he did so, in part, through the use of the PCIC account. Therefore, Aguiar's objection to the Magistrate Judge's findings regarding the read receipts is overruled.

### 5. The Report Did Not Ignore Kaplan's Actions Toward Aguiar

Aguiar's last factual objection argues that the Magistrate Judge ignored facts that establish that Kaplan tried to goad Aguiar by filing frivolous lawsuits. Aguiar raised this argument as part of an unclean hands defense. The Leor Parties argue that the Magistrate Judge properly rejected Aguiar's argument because there is no evidence to support it. Contrary to Aguiar's assertions, the Magistrate Judge did not ignore the evidence. The Report recognizes that Kaplan has filed lawsuits but finds that there is no evidence to support Aguiar's contention that the lawsuits were part of a concerted effort to goad Aguiar. The Court agrees that the evidence does not support a finding that Kaplan filed the suits simply to goad Aguiar. Further,

13

and more importantly, the Report found that Aguiar had failed to establish that Kaplan's allegedly wrongful conduct is directly related to Aguiar's hacking. *See Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993) (stating that for "a defendant to successfully avail itself of the doctrine of unclean hands, . . . the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted"). Therefore, even if the Magistrate Judge had found that Kaplan had tried to goad Aguiar, Aguiar's defense would fail because Aguiar did not demonstrate that Kaplan's lawsuits are responsible for Aguiar's hacking.[21] Consequently, Aguiar's objection is overruled.

### B.  The Procedural Challenges

Aguiar also raises several procedural challenges to the Report: (1) Aguiar asserts it was error for the Magistrate Judge to rely on the Leor Parties' *ex parte* submissions to the Court; (2) Aguiar argues it was improper for the Magistrate Judge to make adverse inferences from Aguiar's exercise of his Fifth Amendment right; (3) Aguiar asserts that he should have been permitted to take discovery regarding alleged threats to the Kaplan family, and (4) the Magistrate Judge improperly shifted the burden of proof from the Leor Parties to Aguiar.  None of these objections have merit as discussed below.

### 1.  It Was Not Error to Consider the Ex Parte Submissions

Aguiar argues, for at least the third time in this litigation, that he is entitled to view the confidential communications submitted to the Court *ex parte* in order to be able to address

---

[21]Aguiar does not object to the Magistrate Judge's finding that Aguiar has not shown a direct relation between Kaplan's filing of the lawsuits and Aguiar's unauthorized access to Kaplan's email.  Furthermore, if Aguiar were to argue that the lawsuits are what led to the hacking he would be tacitly admitting that: (1) he hacked Kaplan's email account and (2) he did so because of the lawsuits, not because of security concerns.

whether the Leor Parties were actually prejudiced when Aguiar obtained the confidential

communications.  Aguiar objects to the Report because, he argues, it is improperly based on the

substance of the *ex parte* submissions.  However, Aguiar misreads the Report.  The Report does

not rely on the *substance* of the confidential emails.  While the Report does cite to the

confidential emails, it does so simply to establish that there is record evidence that Aguiar

obtained access to confidential communications.  As this Court previously pointed out in its

Order Denying Motion for Access and for Hearing [DE-422 in case no. 09-60136], "it is not the

specific content of the privileged communications that matter but whether and how a party has

gained access to those communications. Therefore, the specific content of the hacked Kaplan

emails is not relevant to determining whether sanctions should be imposed or whether Aguiar is

in contempt." *See Eagle Hospital Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306

(11th Cir. 2009) (upholding the trial court's imposition of sanctions based on the fact that the

defendant had access to privileged materials, had engaged in extensive and disruptive

surveillance of privileged communications, and possibly continued to have access to privileged

communications).  Thus, Aguiar's objection based on the *ex parte* submission of the confidential

emails is overruled.

### 2. It Was Not Error to Draw and Rely on Adverse Inferences

Aguiar also objects to the fact that the Magistrate Judge drew adverse inferences from

Aguiar's invocation of his Fifth Amendment right.  Importantly, Aguiar does not actually

challenge the legal propriety of drawing the inferences.  Instead, Aguiar argues that the

inferences drawn by the Magistrate Judge are particularly weak and not a substitute for real

evidence.  However, Aguiar has not explained why the inferences in this case are particularly

weak. In this objection, Aguiar also appears to be raising a Sixth Amendment argument as well. Aguiar argues that not allowing his counsel to view the privileged Kaplan emails essentially deprived him of his Sixth Amendment right to counsel because counsel could not properly advise him on whether it was necessary for him to assert his Fifth Amendment right. This argument fails for two reasons. First, Aguiar's counsel could have spoken with him about the subject matter of the emails and about his involvement in obtaining them. Thus, counsel could have obtained the necessary information for counseling Aguiar without actually seeing the emails. Second, the Sixth Amendment right to counsel does not apply in civil cases. *Daniel v. U.S. Marshall Service*, 188 F. App'x 954, 958 (11th Cir. 2006) (citing *Mekdeci v. Merrell Nat'l Labs.*, 711 F.2d 1510, 1523 (11th Cir. 1983)). Consequently, Aguiar's objections based on the Fifth and Sixth Amendments are overruled.

### 3. It Was Not Error to Deny Discovery Regarding Threats

Aguiar's next procedural objection asserts that the Magistrate Judge erred by not permitting Aguiar to take discovery regarding alleged threats to the Kaplan family. Aguiar objects because the Report, in finding that Aguiar acted in bad faith, relies, in part, on a finding that Aguiar had threatened Kaplan and his family. Aguiar was not permitted to depose Kaplan or his family members on the topic of threats. Aguiar specifically points to the fact that he was not permitted to depose Kaplan's father, Jay Kaplan. However, he admits that he was permitted and did submit written interrogatories to Jay Kaplan. Furthermore, Aguiar has not explained how he was prejudiced or otherwise harmed by his inability to depose Jay Kaplan or take other discovery regarding threats to the Kaplan family because none of Kaplan's family members testified during the evidentiary hearings.

16

Aguiar also argues that there was no testimony at the evidentiary hearings regarding threats to the Kaplan family. While none of Kaplan's family members testified as to threats by Aguiar, Kaplan himself testified as to threats he received that threatened himself and his family. *See* Transcript of June 9, 2010 Evidentiary Hearing at 32-34. Furthermore, at least one email and a text message sent by Aguiar and containing threats to Kaplan and his family were admitted into evidence. *See* Exs. 61 & 76. Aguiar argues that the Magistrate Judge had stated that he would only consider evidence about threats to Kaplan's family from witnesses if they were subject to deposition and cross-examination by Aguiar's counsel and none of them were made available. However, Kaplan was called as a witness by Aguiar,[22] not by the Leor Parties, and it was on direct that Kaplan testified about threats to his family. Thus, Aguiar is responsible for eliciting the testimony regarding threats to Kaplan and his family. Aguiar did not have to elicit this testimony but once Aguiar's counsel did, he opened the door for any additional testimony on cross-exam. Consequently, this objection is overruled.

### 4. The Magistrate Judge Did Not Shift the Burden from the Leor Parties to Aguiar

Aguiar's last procedural objection argues that the Magistrate Judge improperly shifted the burden of proof as to Aguiar's bad faith from the Leor Parties to Aguiar. Aguiar also asserts that the Report incorrectly concluded that the Magistrate Judge need not determine whether Aguiar acted with subjective bad faith. This assertion misreads the Report. The Report found that, while the case law in the Eleventh Circuit is unclear as to whether the Leor Parties must

---

[22]Kaplan was also called as a witness by the Leor Parties at the October 23, 2009 Evidentiary Hearing. However, Kaplan's testimony on October 23, 2009 was limited to the alleged hacking of his email account and did not address any alleged threats to Kaplan or his family.

demonstrate objective or subjective bad faith, it does not matter because the evidence in this case supports a finding of both objective and subjective bad faith. *See* Report at 27-28.

Aguiar further argues that the Magistrate Judge required Aguiar to prove that his "mental illness prevented him from forming subjective bad faith," *id.* at 28, and this was an improper shifting of the burden of proof. However, Aguiar again misreads the Report. The Report found clear and convincing evidence, including Aguiar's attempt to bribe Holliday, and his emails to Cozzi and Hilliard, that Aguiar had a win-at-all-costs attitude toward this litigation. This evidence, in conjunction with the hacking, demonstrated Aguiar's subjective bad faith. In response to the Leor Parties' proof of subjective bad faith, Aguiar raised his mental health as a *defense*. Thus, once the Leor Parties presented clear and convincing evidence of Aguiar's subjective bad faith, the burden shifted to Aguiar to prove his mental health prevented him from forming subjective bad faith or from complying with the Court's orders. *See Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (stating that once a party seeking civil contempt establishes by clear and convincing evidence that the alleged contemnor had violated an outstanding court order, the burden of production shifts to the alleged contemnor to establish that he was unable to comply and then the burden shifts back to the moving party to establish the ability to comply). The Magistrate Judge found that Aguiar did not demonstrate that his mental illness prevented him from forming the requisite bad faith and also found that the Leor Parties had successfully rebutted any testimony to the contrary. Thus, the Magistrate Judge did not improperly shift the burden to Aguiar.

18

### C. The Objections to Legal Conclusions

Lastly, Aguiar raises several objections to the Magistrate Judge's legal conclusions. Specifically, Aguiar asserts: (1) that it was error for the Magistrate Judge to disregard the testimony regarding Aguiar's mental illness; (2) that the Report's proposed sanctions are unconstitutional; (3) that the Leor Parties, other than Kaplan, should not be permitted to benefit from the sanctions; (4) that there was no evidence that other less severe remedies were inadequate; and (5) alternative remedies exist. None of these objections have merit.

#### 1. The Magistrate Judge Did Not Err in the Weight Given to Dr. Duckworth's Testimony

Aguiar objects to the weight given to the testimony of his psychiatric expert, Dr. Duckworth. Specifically, Aguiar raises two objections: (1) that the Report erroneously substitutes lay opinions for uncontested expert opinions and (2) the Report improperly disregards Dr. Duckworth's opinions because he did not ask Aguiar about the hacking. The Report did neither. The Magistrate Judge found that Dr. Duckworth's conclusions were not within reasonable medical certainty because of the restrictions placed on him in his investigation. This conclusion was based upon clear and convincing record evidence.

Neither party questions Aguiar's diagnosis of bipolar disorder, that he was in a manic phase, and that he was psychotic during the relevant time period. The parties dispute what effect Aguiar's mental state had on his ability to comply with Court orders and to form a bad faith intent. Based on his investigation, Dr. Duckworth concluded that Aguiar's hacking was done based on fear for his safety and that his illness prevented Aguiar from knowing right from wrong and forming the requisite intent. However, other testimony by both Dr. Duckworth and Dr. Resnick question the reliability of these conclusions.

The parties do not dispute that Dr. Duckworth was prohibited from asking Aguiar or any of his secondary sources any questions about the hacking or any questions about Aguiar's mindset on the days that the hacking occurred. Dr. Duckworth was not even permitted to ask whether Aguiar knew that hacking was illegal. As a result of these limitations, Dr. Duckworth testified that he was unable to determine whether the hacking took place during a normal mind state. Transcript of June 8, 2010 Evidentiary Hearing at 109. On cross-examination Dr. Duckworth further testified that the way to get the most information about a patient's mental history and motivation about an event is to ask open-ended questions about the specific event at issue. *Id.* at 96. Dr. Duckworth was unable to do that in this case. *Id.* Dr. Duckworth also testified that people with bipolar disorder, even during episodes, have their moods travel up and down and approach a normal state, *id.* at 109, and that it appeared that, at points during the time period when Aguiar was manic, he was able to recognize what he had done and be deceptive, *id.* at 103-104.[23]

In response to Dr. Duckworth, the Leor Parties had Dr. Resnick testify regarding bipolar disorder in general and Dr. Duckworth's methodology in reaching his conclusions regarding Aguiar. Dr. Resnick testified that most people with bipolar disorder, including those who are psychotic, know the nature and quality of their actions. *Id.* at 177. According to Dr. Resnick, Dr. Duckworth did not have enough data to reach his conclusions within a reasonable degree of medical certainty because of the limitations placed on Dr. Duckworth regarding the hacking. *Id.* at 180, 185-86, 233. Dr. Resnick also testified that Dr. Duckworth had no evidence on which to

---

[23]Additionally, in August 2009 and October 2009, Aguiar appeared in two televised interviews, where he did not exhibit any outward signs of a mental illness.

base his conclusion that Aguiar did not know right from wrong. *Id.* at 187. Furthermore, according to Dr. Resnick, Dr. Duckworth did not have enough information to rule out alternative explanations for Aguiar's actions. *Id.* at 188, 229.

Based on the testimony of both Dr. Duckworth and Dr. Resnick, it is clear that Dr. Duckworth did not have all of the information necessary to conclude within a reasonable degree of medical certainty that Aguiar hacked Kaplan's email account based on Aguiar's security fears and that Aguiar, at the time of the hacking, did not have the requisite intent. Consequently, the Magistrate Judge discounted Dr. Duckworth's opinions regarding Aguiar's motivations and mind-set at the time of the hacking incidents. Without a reliable medical opinion regarding Aguiar's mind-set at the time of the hacking, the Magistrate Judge relied on other evidence to establish that Aguiar acted with bad faith. Having reviewed the testimony of the experts, the Court finds that the Magistrate Judge did not err in discounting Dr. Duckworth's conclusions because of the constraints placed on Dr. Duckworth's investigation into Aguiar's mental health during the time of the hacking and of Aguiar's violation of the Court orders. Thus, this objection is overruled.

### 2. The Sanctions Are Not Unconstitutional

Aguiar asserts that the dismissal of his claims and the striking of his pleadings are an unconstitutional sanction because: (1) it abrogates his right to a jury trial, in violation of the Seventh Amendment; (2) it infringes on Congress's power; and (3) it violates the Due Process Clause of the Fifth Amendment. The Court finds these arguments without merit.

While the Report more than adequately sets out the standard for applying sanctions under a court's inherent power, it is worth restating the standard:

A court may impose sanctions for litigation misconduct under its inherent power. *Chambers*, 501 U.S. at 43-44, 111 S. Ct. 2123; *In re Sunshine Jr. Stores*, 456 F.3d at 1304. The court's inherent power derives from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43, 111 S. Ct. 2123 (quotation marks and citation omitted). This power, however, "must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S. Ct. 2455, 65 L. Ed.2d 488 (1980).

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). . . . A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order. *Byrne*, 261 F.3d at 1121.

*Eagle Hospital*, 561 F.3d at 1306.

Aguiar first argues that the sanctions violate his right to a jury trial and that a court cannot impose such case ending sanctions for misconduct that does not affect the court's management of its docket or does not violate a court order. However, the Report found, not only that Aguiar had violated Court orders, but that Aguiar had also gained an unfair advantage in this litigation by obtaining unauthorized access to Kaplan's email, which contained hundreds of privileged emails that included counsel's mental impressions, thought processes, legal recommendations, and trial strategy. Knowledge is power. Access to this protected information gives an oppenent an unfair advantage that strikes at the heart of the adversarial system. Furthermore, Aguiar's actions more than disrupted the litigation of these two cases, bringing both cases to a standstill while the Court dealt with the Motions for Contempt and for Sanctions. Thus, Aguiar demonstrated bad faith by disrupting the litigation through his hacking and threatening of witnesses. Based on the evidence in this case, the holding in *Eagle Hospital*, and as discussed below, the imposition of case ending sanctions under these circumstances is not unconstitutional.

Aguiar next argues that imposing the recommended sanctions would infringe on Congress's power because the sanctions imposed exceed those contemplated by the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), which permits suits for compensatory damages or equitable relief. However, the Supreme Court has stated that the sanctioning scheme of either a statute or the Federal Rules of Civil Procedure does not displace a court's inherent power to impose sanctions for bad-fath conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). Thus, the Supreme Court has expressly rejected Aguiar's argument, by stating that "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power [to sanction bad faith conduct]." *Id.* at 50. In this case, the Rules are inapplicable because the Leor Parties have moved pursuant to the Court's inherent power, not a particular Rule of Civil Procedure, and the statutory remedies do not address the problems caused by Aguiar's gaining access to privileged communications pertaining to the instant litigation. Hence, under the present circumstances, it is appropriate for the Court to rely on its inherent power.

Last, Aguiar argues that the sanctions violate the Due Process Clause of the Fifth Amendment because, essentially, the punishment does not fit the crime. Aguiar argues that the sanctions amount to a $1 billion dollar penalty. First, that argument makes the double assumption that Aguiar's claims not only have merit but are worth what Aguiar says they are worth. Second, Aguiar's reliance on cases involving punitive damages awards is misplaced. The sanctions imposed here are based on the Court's inherent power to control its docket and to prevent abuse of the judicial process, not on a finding of liability on the underlying claims. Third, in *Eagle Hospital*, the Eleventh Circuit expressly found that case ending sanctions did not

23

violate the defendant's Due Process rights because such sanctions were not an abuse of the trial

court's discretion where the defendant had been intercepting the plaintiff's email, both

confidential and non-confidential, for an extended period of time and thereby had disrupted the

litigation process. 561 F.3d at 1306-07. The Eleventh Circuit did not consider the value of the

claims involved; instead it considered whether such severe sanctions were appropriate given the

defendant's conduct. *Id.* As set forth below, the striking of Aguiar's pleadings are appropriate

under the circumstances and no other sanctions will suffice.

### 3. All of the Leor Parties Were Effected By the Hacking and Therefore Should Benefit from the Sanctions

Aguiar asserts that only Kaplan should benefit from the sanctions imposed because there

is no proof of harm to the other Leor Parties. However, it is not disputed that the Leor Parties

had a joint prosecution and defense agreement, which involved sharing information and work

product and jointly developing theories and strategy. Thus, harm to one party is harm to the

others. Furthermore, the harm is not from the unauthorized access to a particular email that

relates to one of the Leor Parties. To the contrary, the harm comes from the extent of Aguiar's

hacking, the fact that there is no way to know the true extent of Aguiar's hacking because of his

refusal to answer any questions about it or turn over his computers for inspection, the disruption

to the litigation, the abuse of the judicial process, and the fact that Aguiar cannot "unlearn" what

he has seen by accessing Kaplan's emails. *See Eagle Hospital*, 561 F.3d at 1306-07.

Furthermore, there is no question that Kaplan's email contained information shared with the

other Leor Parties before and during litigation that related to the claims in these cases, including

emails between Kaplan and Natbony when Natbony was acting in an attorney capacity and emails containing notes from Katten's lead counsel. Consequently, this objection is overruled.

### 4. Severe Sanctions Are Appropriate Under the Circumstances

Aguiar argues that the Report wrongly concludes that there are no appropriate lesser sanctions that could be imposed. In support of this argument, Aguiar argues that without access to the hacked emails Aguiar cannot defend against the conclusion that a fair trial is impossible and without discussion of the contents of the hacked emails the Report could not explain why a fair trial was impossible. In large part, this argument is a fourth rehash of Aguiar's attempts to be given access to Kaplan's hacked emails. The Magistrate Judge and this Court have previously rejected Aguiar's attempts to gain access to these emails and Aguiar has not presented a convincing reason for gaining access now. As the Court has previously stated in this order and elsewhere, the relevant harm is not Aguiar's access to the content of any particular confidential email but the fact that a party gained access to those communications through unauthorized means.

Aguiar also asserts that *Eagle Hospital* does not control because in *Eagle Hospital* it was believed that the defendant had continuing access to the opposing party's emails. Here, Aguiar argues there is no evidence that he still has access to Kaplan's email account. However, there is clear and convincing evidence that Aguiar obtained unauthorized access to years' worth of emails between Kaplan and his counsel many of which concern the issues in these cases[24] and that Aguiar continues to have access to those emails. Furthermore, while there is no evidence

---

[24]Kaplan testified that, beginning in 2004, he used his email account to communicate with his lawyers about various legal issues, including Leor. *See* Transcript of October 23, 2009 Evidentiary Hearing at 106.

that any recent hacking has occurred, Aguiar's invocation of his Fifth Amendment right leaves the Court unable to assess the extent of the damage Aguiar has caused or whether Aguiar has a means to again hack into Kaplan's email account. Thus, *Eagle Hospital* is controlling. Moreover, as pointed out in *Eagle Hospital*, such severe sanctions serve the additional purpose of deterring other litigants from similar conduct, which helps protect the judicial process from abuse. *See Eagle Hospital*, 561 F.3d at 1306-07.

### 5. No Adequate Alternative Remedies Exist

Lastly, Aguiar objects to the Report because he contends that adequate alternative remedies exist. While Aguiar presented several alternative remedies, the Report considered each and found them unworkable and insufficient under the circumstances. Aguiar suggests the following remedies: (1) a "taint team;" (2) stopping discovery if it is believed to be based on the privileged communications; (3) requiring Aguiar to demonstrate evidence is derived from an independent source; (4) having Aguiar pay the costs Kaplan incurred in transitioning his emails to a new server; (5) requiring Aguiar's current counsel to withdraw; (6) granting Kaplan his costs involved in these motions; (7) limiting Aguiar's use of computers and access to the internet; and (8) requiring Aguiar to continue to undergo psychiatric treatment during the course of this litigation. The Report considered each of these sanctions and found that none of them, alone or together, were sufficient "to remedy the substantial doubt cast on the fairness of these proceedings by Aguiar's unauthorized access of confidential attorney-client communications." Aguiar argues that the Magistrate Judge should have considered a combination of the proposed sanctions.

Both the Magistrate Judge and this Court recognize that "inherent powers must be exercised with restraint and discretion," *Chambers*, 501 U.S. at 44, and that "[t]he severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1306 (11th Cir. 2006) (internal quotations and citation omitted); *Eagle Hospital*, 561 F.3d at 1306 (quoting *In re Sunshine*). In the instant case, no other sanctions are appropriate or can adequately remedy the harm done by Aguiar's unauthorized access to Kaplan's privileged communications. While several of the remedies offer ways to deal with any evidence gained through the hacking, no combination of proposed remedies can adequately deal with the privileged communications accessed by Aguiar that contain counsel's impressions, strategies, thought processes, or legal opinions. No combination of these remedies can make Aguiar unlearn the information he has gained through his unauthorized access of Kaplan's attorney-client privileged emails. None of these remedies, individually or combined, can remedy the disruption to the litigation process or the lack of respect to the judicial process exhibited by Aguiar. None of these remedies, separately or together, can put the Leor Parties back on equal footing with Aguiar. Consequently, the Leor Parties have demonstrated that there is no adequate lesser sanction.

## III. The Leor Parties' Objection

The Leor Parties' only objection to the Magistrate Judge's Report is to the recommendation that the Court deny their request for an award of attorneys' fees and costs made in conjunction with the Motions for Sanctions and Contempt. The Report found that striking Aguiar's pleadings in case no. 09-60136 and dismissing Aguiar's claims in case no. 09-60683,

27

which Aguiar asserts are worth $1 billion, was sufficient redress for Aguiar's actions and would also serve as a future deterrent. The Leor Parties argue that Aguiar's defense against the Motions for Sanctions and Contempt was unreasonable, which increased their burden in litigating the Motions, and that if the Court does not award them their fees and costs they will not be made whole.

A court has discretion "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. In doing so, a court must exercise restraint. *Id.* at 44. Dismissal of Aguiar's claims and his pleadings is a sufficient sanction under the circumstances. To impose additional sanctions would show a lack of restraint and would impose excessive sanctions on Aguiar. *See id.* at 45 (noting that dismissal of a lawsuit, while within a court's discretion, is a particularly severe sanction). Consequently, the Court finds that assessing attorneys' fees and costs against Aguiar in addition to the dismissal of his claims and pleadings would amount to an abuse of the Court's discretion and would not be an appropriate sanction under the circumstances.

Having carefully reviewed, *de novo*, Magistrate Judge O'Sullivan's Report and Recommendation, the record, and the parties' objections, the Court finds that Aguiar violated Judge O'Sullivan's orders regarding witness tampering and intimidation and thus is in contempt of Court. The Court also finds that Aguiar acted with bad faith when he hacked into Kaplan's email and thus sanctions are appropriate. Accordingly, it is hereby

ORDERED that

1. The Magistrate Judge's Report and Recommendation is adopted in part. The Court adopts all of the Magistrate Judge's findings of fact and conclusions of law, with the exception

28

of the Report's finding of that the restaurant incident violated the Court's witness tampering order.

2. Aguiar's Objections [DE-412 in case no. 60136 and DE-290 in case no. 09-60683] are OVERRULED, except for his objection to the Magistrate Judge's reliance on the restaurant incident, which is sustained.

3. The Leor Parties' Limited Objection to the June 29, 2010 Report and Recommendation [DE-411 in case no. 09-60136 and DE-288 in case no. 09-60683] is OVERRULED.

4. The Leor Parties' Motion for Sanctions Against Guma Aguiar [DE-135 in case no. 09-60136 and DE-51 in case no. 09-60683] is GRANTED.

5. The Leor Parties' Corrected Motion to Hold Guma Aguiar in Contempt [DE-228 in case no 09-60136 and DE-126 in case no. 09-60683] is GRANTED in part.

6. Aguiar's Answer and Defenses in Case No. 09-60136 [DE-60] are STRICKEN.

7. Aguiar's claims in Case No. 09-60683 [DE-47] are STRICKEN.

DONE and ORDERED in Miami, Florida, this 28 day of September, 2010.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record

29